742 So.2d 381 (1999)
Michael H. SALIT, Donna Salit, David Lobel, and Lola Lobel, Appellants,
v.
RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A., Elliott B. Barnett, Paul B. Kravitz, and Modami Services, Inc., Appellees.
No. 97-4198.
District Court of Appeal of Florida, Fourth District.
August 25, 1999.
*382 Marshall J. Osofsky of Lewis, Vegosen, Rosenbach, Silber & Dunkel, P.A., withdrawn as counsel after filing brief, West Palm Beach, for appellants.
Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, and Sidney A. Stubbs, Jr., of Jones, Foster, Johnston *383 & Stubbs, P.A., West Palm Beach, for appellees.
GROSS, J.
Appellants Michael and Donna Salit, and David and Lola Lobel appeal a trial court order granting a motion to dismiss with prejudice for failure to state a cause of action pursuant to Florida Rule of Civil Procedure 1.140(b)(6).
Review of this case requires close examination of the amended complaint. A motion to dismiss under Rule 1.140(b)(6) admits all well pleaded facts as true, as well as reasonable inferences arising from those facts; the allegations must be construed in the light most favorable to the plaintiffs. E.g., Vienneau v. Metropolitan Life Ins. Co., 548 So.2d 856, 858 (Fla. 4th DCA 1989).
The amended complaint tells the following story.[1] In 1985, Michael Salit ("Salit") and David Lobel ("Lobel") acquired patent rights to dehydrated yogurt products from an affiliate of an Israeli university. They began working with Serodan Food Industries, Inc., Ltd. ("Serodan"), an Israeli company, to develop and manufacture the yogurt products. Salit and Lobel formed Instant Yogurt Products, Inc. ("Instant Yogurt") in 1985 to sell yogurt products in the United States. In 1988, Salit and Lobel formed a Florida corporation, Modami Services, Inc. ("Modami Florida") to export products from the United States to Israel. At the time of its formation, Modami Florida was not connected to the yogurt products business conducted by Instant Yogurt.
In 1990, Salit and Lobel asked Paul Kravitz to assist them in obtaining financing for the yogurt products business. They decided to use Modami Florida to obtain the financing. They agreed that Michael and Donna Salit would own 45% of the company, that Lola Lobel would own 45% of the company, and that Kravitz would own 10% of the company. Salit and Lobel assigned all of their patent and other rights to the yogurt products to Modami Florida and Instant Yogurt ceased to operate.
In December, 1991, the corporation Modami Delaware ("Modami") was formed and previous incarnations of the corporation were merged into it in 1992. In August, 1992, Modami completed a public offering of 1,253,000 shares of common stock. After the offering, there were 2,959,296 shares outstanding; the Salits and Lola Lobel each owned 19% of the common stock, Kravitz owned 4%, and the balance of the shares were owned by the general public. The board of directors consisted of Salit, Lobel, and Kravitz. Salit was chairman of the board, Kravitz was president, and Lobel was the secretary, treasurer, and chief financial officer.
Modami contracted with Nutrix, Ltd., an Israeli corporation to produce yogurt products. Nutrix was formed as the successor to Serodan, the company with which Salit and Lobel had originally done business.
In 1993, Kravitz hired lawyer Elliott Barnett to represent Modami. At the time, Barnett was a senior partner in the law firm Ruden, McCloskey, Smith, Schuster and Russell ("the Ruden firm" or "the law firm"). The amended complaint alleges:
Unknown at the time to Salit and Lobel, but known to Kravitz, Barnett ... was under great pressure from his law firm to produce business, and was experiencing substantial personal financial problems. Barnett and Kravitz devised a scheme to wrest control of Modami from Salit and Lobel for the personal benefit of Barnett and Kravitz (the "Barnett-Kravitz Scheme"). All subsequent actions of Barnett and Kravitz described herein were in furtherance of this *384 Scheme. All actions of Barnett alleged herein through September 30, 1995[2] were in his capacity as a partner of the Ruden Firm.
As part of a plan to take over Modami, Kravitz "fostered animosity" between the principal officers of the corporation, such that Lobel resigned all of his positions with Modami.
On March 10, 1994, Barnett, in his capacity as "outside General Counsel" to Modami wrote on the Ruden firm's letterhead to Salit and advised him that the board of directors had determined that Salit should "step aside" as chief executive officer, that his offices had been locked, and that he should stay away from the corporate offices until the next board meeting.
The Modami board met on March 11, 1994 at the offices of the Ruden firm. Present were Barnett, Kravitz, and two other directors. The meeting was transcribed by a court reporter. Kravitz reported that the company had a "`serious problem' that our counsel, [the Ruden firm], has discovered that relates to Michael Salit's improprieties." Barnett presented a resolution to the directors to temporarily relieve Salit of his corporate duties and to elect Kravitz as chief executive officer of the company. The directors adopted the resolution.
Barnett and Kravitz went to Israel on March 12 or 13, 1994. There they met with the principals of Nutrix and
falsely accused Salit and Lobel of having secret conflicts of interest, misappropriating funds, and making material misrepresentations and omissions in the Public Offering (the "Accusations").... The Israelis ... were offered $500,000 to testify against Salit and Lobel. Otherwise, Kravitz and Barnett told the Israelis that if they did not testify as Kravitz and Barnett wished them to, they would be subject to accusations of collusion and then their company [Nutrix] would go into bankruptcy. Therefore, the Israelis orally corroborated some of the Accusations concocted by Barnett and Kravitz.
At a Modami board meeting held on March 17, 1994, at the offices of the Ruden firm, the board terminated all of Salit's positions with the company, based on the investigation conducted by Barnett. The board elected Kravitz chief executive officer and authorized the Ruden firm to file lawsuits against Salit, Lobel, and "any other parties the Ruden Firm deemed appropriate."
The Ruden firm filed a lawsuit against the Salits and the Lobels based on allegations of conflicts of interest, of misappropriating funds, and of making material misrepresentations and omissions concerning the public offering. Barnett and Kravitz caused Modami to issue press releases and to make filings with the Securities and Exchange Commission that repeated such allegations. As a result, the market price of Modami stock declined significantly. After the filing of the suit, the Israelis disclosed Barnett's role in extorting them to give false testimony.
As a result of the successful implementation of the "scheme" to take over Modami, both Kravitz and the Ruden firm received financial benefits. The Ruden firm collected more than $3 million in legal fees from Modami in 1994 and 1995 "as a result of the Barnett-Kravitz" scheme. The firm expelled Barnett in September, 1995 and he went to work for Modami.
Barnett and Kravitz caused Modami to abandon the yogurt products business and "embark on a spree of acquisitions of new businesses in exchange for common stock." By 1996, there were 62,000,000 shares of Modami outstanding. The company sustained large losses. The Salits' and Lobels' ownership interest in Modami was *385 greatly diluted. The value of their holdings declined from $1.9 million each in August, 1993 to about $25,000 each in May, 1996.
The trial court dismissed all counts of the amended complaint against the Ruden firm with prejudice for reasons which are unclear, and appellants timely appealed. This case concerns the viability of various causes of action against the law firm.
As to all counts, the Ruden firm argues that the trial court correctly dismissed the complaint because there is a repugnancy between the allegations of the complaint which compels the conclusion that, as a matter of law, Barnett's participation in the Modami scheme was "outside the scope of his agency" with the law firm, so that his actions cannot be attributed to it. The firm points to paragraph 25 of the amended complaint which states that Barnett and Kravitz "devised a scheme to wrest control of Modami ... for the personal benefit of Barnett and Kravitz."
The law firm's liability in this case turns on the plaintiffs' ability to attribute Barnett's actions to the firm. An employer is responsible for the wrongful acts of its employee if the conduct of the employee is within the scope of his employment, which includes acts "of the kind he is employed to perform" and that conduct "occurs substantially within authorized time and space limits and ... is activated at least in part by a purpose to serve the [employer]." Whetzel v. Metropolitan Life Ins. Co., 266 So.2d 89, 91 (Fla. 4th DCA 1972); Kane Furniture Corp. v. Miranda, 506 So.2d 1061, 1067 (Fla. 2d DCA 1987); Gates v. Utsey, 177 So.2d 486, 488 (Fla. 1st DCA 1965).
Although paragraph 25 of the amended complaint does assert that Barnett and Kravitz devised the Modami scheme for their personal benefit, that paragraph also asserts "Barnett at that time was under great pressure from his law firm to produce business" and that "[a]ll actions of Barnett alleged herein through September 30, 1995 were in his capacity as a partner of the Ruden Firm." The pleading claims that the Ruden firm reaped more that $3 million in legal fees as a result of the Barnett-Kravitz scheme.
It is not a fatal repugnancy in pleading to say that an employee realizes personal benefit from his conduct, while at the same time benefitting, at least in part, his employer. That the employee personally profits from his actions does not negate, in all circumstances, the vicarious liability of the employer for the acts of the employee.

Count ITortious Interference with Contract
In Count I of the amended complaint, Salit sued Kravitz, Barnett, and the Ruden firm for tortious interference with contract. The pleading alleges that in November, 1993, Salit entered into a contract with Modami whereby the corporation agreed to employ him as chief executive officer for a five year term; that Salit performed all of his obligations under the employment contract; that all defendants knew of the contract; that Barnett, "acting for himself and his law firm and for their own interest and benefit and independent of their positions as General Counsel of Modami, interfered with the employment agreement between Modami and Salit by intentionally and unjustifiably presenting the false [a]ccusations described above" to Modami's board of directors in March, 1994, knowing that the accusations were false, and that as a result the board terminated Salit's contract.
The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference. See Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 *386 (Fla.1985); Procacci v. Zacco, 402 So.2d 425, 426 (Fla. 4th DCA 1981); Linafelt v. Bev, Inc., 662 So.2d 986, 989 (Fla. 1st DCA 1995). For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship. See Abruzzo v. Haller, 603 So.2d 1338 (Fla. 1st DCA 1992); O.E. Smith's Sons, Inc. v. George, 545 So.2d 298, 299 (Fla. 1st DCA 1989); West v. Troelstrup, 367 So.2d 253, 255 (Fla. 1st DCA 1979).
The law firm argues that a reason for dismissal appears on the face of the complaint; as general counsel of Modami, it was not a third party to the contractual relationship between the corporation and Salit, so that its interference, if any, was justified.
However, the "privilege to interfere" enjoyed by an officer or employee of a contracting party is not absolute. The privilege is destroyed where an employee acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest. See O.E. Smith's Sons, 545 So.2d at 299; Sloan v. Sax, 505 So.2d 526, 528 (Fla. 3d DCA 1987); Scussel v. Baiter, 386 So.2d 1227 (Fla. 3d DCA 1980).
The amended complaint covers all the elements of the cause of action, except for one-having pled the Ruden firm's status as general counsel, it fails to allege the reasons why the law firm's participation in Salit's termination was unjustified under the rule of Sloan and O.E. Smith's Sons. For example, in Sloan, a counterclaim raised a tortious interference claim against the advertising director of Ryder System, Inc. for inducing Ryder to terminate its contract with the plaintiff ad agency. The third district held that the complaint adequately stated a claim against an employee of Ryder, since it alleged that the employee's conduct "was harmful to Ryder," was "not done with `any good faith belief that the breach of contract would be in the interest of Ryder,'" and was "outside the scope of [the defendant's] responsibilities as advertising director of Ryder." 505 So.2d at 528.
Although the amended complaint generally states that the Ruden firm acted "independent" of the position as general counsel, it fails to allege that the firm participated, through Barnett, in Salit's termination without an honest belief that its actions would benefit Modami and that Salit's termination was not in Modami's best interest.
The trial court did not dismiss the amended complaint for this reason. Appellants requested the opportunity to amend in their motion for rehearing. There had been but one amended complaint. There was no showing that appellants would be unable to amend to state a cause of action. For these reasons, we reverse the dismissal of this count, and remand with leave for appellants to file a second amended complaint.

Count IIInjurious Falsehood
Count II of the amended complaint attempted to state a claim for injurious falsehood. The heart of the claim is that Barnett and Kravitz caused false statements regarding Salit and Lobel to be published in Modami press releases and in Securities and Exchange Commission filings, which directly caused the price of Modami stock to fall.
A group of torts recognized under the collective title of "injurious falsehood" are often interchangeably called slander of title, disparagement of property, or trade libel. See Sailboat Key, Inc. v. Gardner, 378 So.2d 47, 48 (Fla. 3d DCA 1979). The gist of the tort of injurious falsehood is the "intentional interference with another's economic relations." Procacci, 402 So.2d at 426; W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 964 (5th ed.1984).
In Lehman v. Goldin, 160 Fla. 710, 36 So.2d 259, 260 (1948), the supreme court *387 adopted sections 624-626 of the Restatement of Torts as the "law applicable" to the tort of injurious falsehood:[3]
Sec. 624. General Rule.
One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property, in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused.
Sec. 625. IntentionScienterMalice.
One who publishes matter disparaging to another's property in land, chattels or intangible things is subject to liability under the rule stated in Sec. 624 although he
(a) did not intend to influence a third person's conduct as purchaser or lessee of the thing in question
(b) neither knew nor believed the disparaging matter to be false;
(c) did not publish such matter from ill will toward the other or a desire to cause him loss.
Sec. 626. Disparaging Statements of Fact.
One who without a privilege to do so published an untrue statement of fact which is disparaging to the quality of another's land, chattels or intangible things, under circumstances which would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof would be determined thereby, is liable for pecuniary loss resulting to the other from the impairment of vendibility so caused.
(Citations omitted).
Cases after Lehman have ruled that any kind of legally protected property interest which is capable of being sold or transferred may be the subject of disparagement. See Maass v. Christensen, 414 So.2d 255, 257 (Fla. 4th DCA 1982); Gates, 177 So.2d at 489. After noting that "corporate shares" are one example of a such a property interest, Prosser and Keeton observe:
that entirely too much emphasis has been placed upon the property element. The gist of the tort is the interference with the prospect of sale or some other advantageous relation; and it is equally possible to disparage the plaintiff's business by reflecting upon its existence or character, [or] the manner in which it is conducted ... without affecting any property. *388 W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 966 (5th ed.1984) (emphasis supplied); Gates, 177 So.2d at 489.
Here, the amended complaint appears to have stated most of the elements of injurious falsehood. The pleading alleges that (1) falsehoods about Salit, Lobel, and the manner in which they conducted Modami's business; (2) were published or communicated to third persons (the Securities and Exchange Commission and recipients of press releases); (3) the defendants knew the falsehoods would likely influence prospective purchasers of Modami stock; and (4) the falsehoods played a material and substantial part in inducing others not to buy common stock, so that the stock declined in value. See Bothmann v. Harrington, 458 So.2d 1163, 1168 (Fla. 3d DCA 1984).
The law firm contends that the statements to the SEC and the press releases were privileged. This argument raises matters which are in the nature of affirmative defenses. If the basis for a privilege is proven, then the plaintiff is required to prove actual malice in order to prevail. See Allington Towers Condominium N., Inc. v. Allington Towers N., Inc., 415 So.2d 118, 119-20 (Fla. 4th DCA 1982).
The amended complaint omits one crucial element of injurious falsehood. To state a claim, a plaintiff must specifically plead special damages. See Continental Dev. Corp. of Florida v. Duval Title and Abstract Co., 356 So.2d 925, 927 (Fla. 2d DCA 1978). The "special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 971 (5th ed.1984); see Collier County Pub. Co., Inc. v. Chapman, 318 So.2d 492, 495 (Fla. 2d DCA 1975) ("Damages recoverable in an action for trade libel are the plaintiff's pecuniary losses."). As an example, Prosser and Keeton refer to a slander of title case, where a plaintiff seeks recovery for the decline in his land's market value. W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 971 n. 3 (5th ed.1984). Such a claim is an item of general damages, not special damages. "The chief characteristic of special damages is a realized loss." Id.
In this case, appellants have claimed only that their stock declined in value. Their pleading does not reveal any "realized loss," that characteristic of "special damage" that is a crucial element of the cause of action. On remand, appellants shall be given leave to replead the injurious falsehood count.
Finally, we disagree with the law firm's contention that appellants could bring this count only as a derivative action. A derivative suit is an action in which a stockholder seeks to enforce a corporate right or to prevent or remedy a wrong to the corporation, where the corporation, because it is controlled by the wrongdoers or for other reasons, fails and refuses to take appropriate action for its own protection. See Fort Pierce Corp. v. Ivey, 671 So.2d 206, 207 (Fla. 4th DCA 1996); Alario v. Miller, 354 So.2d 925, 926 (Fla. 2d DCA 1978). A direct or individual action is a suit by a stockholder to enforce a right of action existing in the stockholder. See Fort Pierce Corp., 671 So.2d at 207. As this court wrote in Head v. Lane, 495 So.2d 821, 823 (Fla. 4th DCA 1986), the "origin and purpose of a shareholder's derivative action were classically stated by Justice Jackson" in Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949):
Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers. Equity, however, allowed him to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own. It required him first to demand that the corporation vindicate its own rights but when, as was usual, those who perpetrated the wrongs also were able to obstruct any remedy, equity would *389 hear and adjudge the corporation's cause through its stockholder with the corporation as a defendant, albeit a rather nominal one. This remedy born of stockholder helplessness was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses.
In this injurious falsehood count, appellants seek compensation for damage to their personal property interests as shareholders. They do not seek to obtain some benefit that would inure to the corporation. The case was properly brought as a direct claim. See Wolfe v. American Sav. and Loan Ass'n, 539 So.2d 606 (Fla. 3d DCA 1989); Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969) (holding that a suit against majority shareholders for decreased value of stock not derivative).
We distinguish this case from Hill v. Brady, 24 Fla. L. Weekly D1864, 737 So.2d 1243 (Fla. 5th DCA 1999), in which the plaintiff's cause of action was, in essence, a breach of a fiduciary duty owed by a president and chief financial officer to the corporation that employed them. The injurious falsehood claim in this case does not derive from a duty or obligation owed to the corporation; the gist of the claim is the intentional interference with the appellants' property rights as shareholders of the corporation. To state a claim, appellants must show special damages, a loss actually sustained by them which might not be common to other shareholders.

Count IVProfessional Malpractice
In Count IV of the amended complaint, the Salits and Lola Lobel bring what amounts to a professional malpractice action against the Ruden firm. The basis of the firm's duty is the attorney-client relationship between the law firm and Modami. There is no allegation that the law firm represented any of the appellants individually. An attorney who represents a corporation is "not in privity with and therefore owes no separate duty of diligence and care to an individual shareholder absent special circumstances or an agreement to also represent the shareholder individually." Brennan v. Ruffner, 640 So.2d 143, 146 (Fla. 4th DCA 1994). Dismissal of this count was therefore proper. On remand, appellants shall have leave to plead a derivative claim. See § 607.07401, Fla. Stat. (1997). We do not reach the issue of whether such a derivative claim may be maintained in this case.

Count VIDefamation
In Count VI of the amended complaint, Salit and Lobel sue the law firm for defamation, a count which involves damage to their personal reputations. See Sailboat Key, 378 So.2d at 48. The amended complaint adequately states a claim for defamation. See Jackson v. Bellsouth Mobility, Inc., 626 So.2d 1085, 1086 (Fla. 4th DCA 1993); Southern Bell Tel. & Tel. Co. v. Barnes, 443 So.2d 1085 (Fla. 3d DCA 1984).
The order dismissing the amended complaint with prejudice is reversed and the case is remanded to the trial court, where appellants shall have leave to file a second amended complaint.
DELL and SHAHOOD, JJ., concur.
NOTES
[1] We note that the amended complaint would have benefitted from greater precision in pleading and economy in language.
[2] The amended complaint alleged that Barnett was expelled from the Ruden firm on or about September 30, 1995.
[3] The supreme court has never adopted the Restatement of Torts (Second) §§ 623A-652 (1977) as applicable to injurious falsehood. Both this court and the third district have cited to the second restatement only in passing. See Procacci v. Zacco, 402 So.2d 425, 427 (Fla. 4th DCA 1981); Bothmann v. Harrington, 458 So.2d 1163, 1168 (Fla. 3d DCA 1984). The Second Restatement's approach to injurious falsehood, unlike the original restatement, bases liability upon a defendant's knowing or reckless falsehood. See W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 970 (5th ed.1984). Section 623A of the Second Restatement provides:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.
Prosser and Keeton indicate that the Second Restatement's approach to the tort of injurious falsehood "has much to commend it: a good deal of confusion would be removed, and liability would be placed squarely on serious fault ... and to a large extent the matter of privileges, with their shifting burdens of proof, would likewise be avoided." W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 970 (5th ed.1984). Some Florida law in this area is based on the "unsound analogy to personal defamation, when the proper analogy is rather to cases of interference with contract or to fraud." Id. at 969; see, e.g., Sailboat Key, Inc. v. Gardner, 378 So.2d 47, 48 (Fla. 3d DCA 1979).