785 So.2d 564 (2001)
BEACON PROPERTY MANAGEMENT, INC.; and Ernest W. Willis, Appellants,
v.
PNR, INC., a Florida corporation d/b/a Goodfellas, Appellee.
No. 4D99-627.
District Court of Appeal of Florida, Fourth District.
April 4, 2001.
Rehearing Denied June 5, 2001.
*566 David J. Maher and Mark Hicks of Hicks and Anderson, P.A., Miami, for appellants.
C. Vincent LoCurto of the Law Office of C. Vincent LoCurto, P.A., Fort Lauderdale, for appellee.
FARMER, J.
This dispute originated in a long term lease. The tenant was a restaurant in a commercial building. After several years of operation under the lease, the original tenant sold the business and transferred the leasehold to PNR, who took over operation of the restaurant. PNR contended that it was induced to enter into the transaction in part by conversations with two investors of the corporate landlord.[1] PNR attributed the later demise of the restaurant to a failure of the landlord to make repairs to the building, culminating in the total collapse of one of its walls. As a result of the collapse, the part of the building in which the restaurant was located was declared uninhabitable by the local authorities and the restaurant was temporarily barred from operating. Although the restaurant briefly reopened after the repairs were made, it closed within a few months.
PNR sued the corporate landlord, two of its investors, and a management company hired by the landlord to superintend the building. The landlord did not appear or defend, and one of the two investors settled with PNR before trial. The case against the remaining investor and the management company (defendants) was submitted to a jury on theories of unfair and deceptive trade acts or practices, fraud, negligent representations, tortious interference with contract and wrongful eviction. The jury returned a verdict awarding substantial compensatory and punitive damages. We reverse.
We granted oral argument primarily to consider PNR's argument that the landlord's conduct in "intentionally neglecting" [sic] the demised premises and failing to make necessary repairs "causing it to violate nearly every basic building code provision" amounted to unfair and deceptive trade acts or practices, and defendants' counter argument that as a matter of law PNR is not entitled to relief under the Florida "Deceptive and Unfair Trade Practices Act" (DUTPA) because PNR's claims *567 do not involve "consumer transactions".[2] We have carefully examined the evidence regarding the alleged deceptive and unfair trade practices acts, as well as the related fraud and negligent misrepresentation claims.
As a result of our review, we assume but do not decide that DUTPA is not limited to purely consumer transactions. A number of federal courts in Florida have held the contrarythat DUTPA is limited to claims involving consumer transactions. See e.g. Bryant Heating & Air Cond. Corp. v. Carrier Corp., 597 F.Supp. 1045 (S.D.Fla. 1984); Packaging Corp. Int'l v. Travenol Lab., Inc., 566 F.Supp. 1480 (S.D.Fla. 1983); LJS Co. v. Marks, 480 F.Supp. 241 (S.D.Fla.1979). The essential command of DUTPA is found in section 501.204(1), which provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."[3] The Legislature has explicitly said that DUTPA was designed "to protect the consuming public and legitimate business enterprises" from "unfair methods of competition" and unfair "trade practices" in any business.[4] On their face, these purposes seem consistent with applying DUTPA to non-consumer transactions, at least where they involve practices of anti-competitive conduct affecting the consuming public. In the case we face today, however, it turns out that it is not necessary for us to resolve this statutory question. We therefore express no holding on the accuracy of these federal court readings of state law.
It is apparent that PNR's DUTPA contention is tied to two specific areas of conduct: (1) the failure to maintain the premises, resulting in deficiencies that made operation of the restaurant impossible; and (2) certain representations made to induce PNR's purchase of the restaurant business. The lease required the landlord to maintain the premises. Plainly a failure to make repairs, allowing the premises to deteriorate to the point that code provisions were violated would be a substantial breach of the lease, entitling the tenant to a number of remedies. A breach of the lease covenant to maintain the premises, however, cannot be charged against anyone except the landlord. The effect of a successful DUTPA claim under these circumstances would be to give the tenant a remedy against third parties for a duty that rests with the owner of the premises.
Thus to deem breaches of covenants in commercial leases unfair or deceptive trade acts or practices would be to begin converting many breaches of contract of commercial leases into DUTPA claims. The essence of DUTPA is to condemn "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce...." We do not read DUTPA to mean that the kind of breaches of commercial leases involved here directly concern consumer protection or Florida's interest in insuring fair methods of competition, not to mention deceptive trade practices.[5] A breach of the *568 covenant to maintain the premises in a commercial lease is not inherently unconscionable or deceptive, and it does not seem to involve "methods of competition" or "trade practices" affecting competition.
The operative words of section 501.204(1) are methods and practices. The ordinary meaning of the noun method is "a means or manner of procedure, especially a regular and systematic way of accomplishing something."[6] The ordinary meaning of the noun practice is "a habitual or customary action or way of doing something." Id. at 1422. A single instance of doing something does not make it a method or a practice. Evidence that the landlord acted in a particular way with this tenant does not prove "a regular and systematic way of" competition, or "a habitual or customary action or way of doing something." The evidence is limited to the lease in question and does not imply the existence of method, or of a habitual or customary pattern of conduct. Equally, the evidence does not suggest any effect on competition in the relevant market of commercial landlords. Consequently, we conclude that the judgments based on DUTPA must be set aside.
We are also unable to find any evidence supporting the claims of fraud and negligent misrepresentation. The critical events concern the transfer of the leasehold by the original tenant to PNR and representations made to induce that transaction. The evidence shows without contradiction that only the settling investor made representations to PNR about future construction and the landlord's plans for the premises. The only evidence of representations made by the defendant investor to PNR to induce the assumption of the lease related to common area maintenance issues, all of which proved to be correct. There is no evidence that any of the defendant investor's dealings with PNR, whether individually or on behalf of the management company he controlled, amounted to a fraud or a misrepresentation.
Thus only the corporate landlord could conceivably be vicariously liable for any fraud or negligence involved in the misrepresentations made by the settling investor. There is no theory of law that would make the defendant investor personally liable for the settling investor's misdeed or for the landlord's vicarious liability. And because the settling investor who made the representations was not an officer of the management company (only of the landlord), and the evidence does not show that he acted on its behalf, neither could the management company be liable. Hence there is no basis for damages of any kind on the fraud and negligent misrepresentation claims against the defendant investor and the management company.
Turning to the claim for intentional interference, PNR initially alleged that defendants interfered with a "prospective business relationship," referring to future patrons of the restaurant. The nature of the alleged interference was said to lie in the failure of the landlord to maintain the building, resulting in the loss of business. At the end of PNR's case at trial, however, the court permitted the intentional interference claim to be amended to redirect the claim at an alleged interference with the lease contract instead of future patrons of the restaurant. We agree with defendants that the court erred in permitting the amendment of the claim at this point in the case. See Arky, Freed, Steams, Watson, Greer, Weaver & Harris P.A. v. Bowmar *569 Instrument Corp., 537 So.2d 561 (Fla. 1988) (holding that party alleging specific claim not proved at trial, who instead proved different allegation not pleaded for the opposing party to prepare a defense, was precluded from recovery on the unpleaded claim).
Even if the amendment were proper, however, the claim failed to state a cause of action. In Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So.2d 381, 385 (Fla. 4th DCA 1999), we said that the elements of a claim for tortious interference with a contract or business relationship are:
(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference.
We added that "[f]or an interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." Id. at 386. In Salit, the defendant was a law firm which was general counsel to a corporation, and the plaintiff sought to allege that the firm had interfered with his position in the corporation. We held that the attempt to plead intentional interference against the entire law firm for the actions of one of its shareholders was insufficient in failing to allege facts showing that the conduct of the lawyer was unjustified.
Here both defendants were agents of the landlord and are thus presumptively incapable of interfering with the landlord's lease contractat least in the absence of allegations and proof that they "act[ed] solely with ulterior purposes, without an honest belief that [their] actions would benefit the employer, and [their] conduct... is not in the employer's best interest." Salit, 742 So.2d at 386. The conduct of these agents proved at trial was entirely consistent with benefitting the landlord and lacked any evidence of an ulterior purpose or the lack of an honest belief that they were benefitting their employer. The fact that the defendant investor desired to see the building sold and in fact profited from the ultimate sale is only stronger evidence of acting on behalf of the corporate entity whose shares he owned.
Moreover, the unjustified interference claim was pleaded as disturbing the restaurant's "relationship" with prospective patrons. The tort of unjustified interference with a business relationship requires the existence of a present relationship, not prospective relationships that one hopes to have in the future. See Salit, 742 So.2d at 385 ("The elements of tortious interference with a contract or business relationship [include] the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights ...." (emphasis added)). We do not believe that the restaurant's prospect of having future customers constitutes a sufficient existing business relationship for the tort of unjustified interference.
Finally we also reverse the damages awarded against defendant investor and the management company on the theory of wrongful eviction. This theory was not pleaded by PNR, and the trial court permitted it to be added after PNR completed its evidence at trial. The trial court erred in permitting PNR to add it after plaintiff had rested its case at trial. Arky, Freed, Stearns, Watson, Greer, Weaver & Harris P.A. v. Bowmar Instrument Corp., 537 So.2d 561 (Fla.1988). Furthermore, the evidence shows that the eviction action filed when the restaurant *570 had been closed after the wall collapsed was solely initiated and prosecuted by the settling investor in the name of the corporate entity. Any claim for wrongful eviction would lie solely against the landlord or the settling investor.
In sum we reverse the judgments against Willis and Beacon discussed above and direct the entry of judgment in their favor as to these causes of action.
DELL and SHAHOOD, JJ., concur.
NOTES
[1] The building was then titled in the name of a corporation, whose shares were owned by Giacomino and Willis. These two investors were apparently also the officers and directors who, in varying degrees, actually directed and managed the corporate entity.
[2] See Ch. 501, Part II, Fla. Stat. (2000).
[3] § 501.204(1), Fla. Stat. (2000).
[4] See §§ 501.202(2) ("The provisions of this part shall be construed liberally to ... protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.").
[5] See § 501.202(1), Fla. Stat. (2000) ("The provisions of this part shall be construed liberally... to simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.").
[6] AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1135 (3rd ed.).