[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13536
_____

D.C. Docket No. 9:17-cv-81135-RLR


M & M REALTY PARTNERS AT HAGEN RANCH, LLC,
a New Jersey limited liability company,

Plaintiff – Appellant,

versus

WILLIAM MAZZONI,
as Co-Trustee of the William Mazzoni Trust
dated 06/04/1992,
THOMAS A. SMITH,
as Co-Trustee of the William Mazzoni Trust
dated 06/04/1992,
WILLIAM MAZZONI,
Individually,
WILLIAM MAZZONI TRUST DATED 06/04/1992,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(December 11, 2020)

Before TJOFLAT, NEWSOM, and GINSBURG,[*] Circuit Judges.

GINSBURG, Circuit Judge:

M&M Realty Partners at Hagen Ranch, LLC, a New Jersey Limited Liability Company, entered into a contract with the William Mazzoni Trust in 2011 for the purchase of a plot of land in Boynton Beach, Florida. The contract included a six-year period for M&M to secure the permits necessary to develop the property. M&M alleges, and the Trust disputes, that M&M sought to close the transaction in conformance with the contract and the Trust refused. M&M seeks specific performance of the land sale contract and damages from the Mazzoni Trust, as well as damages from William Mazzoni, as co-trustee and agent of the Trust, for tortious interference with the land sale contract.

As did the district court, we hold M&M failed to make out a prima facie claim for specific performance or for damages for breach of contract because M&M did not provide evidence that it was ready, willing, and able to perform under the contract -- specifically, that it had the necessary funds to make the purchase. We also hold William Mazzoni, as a co-trustee of the Defendant trust and signatory as its agent on the contract, is not liable for tortious interference. We therefore affirm the judgment of the district co

---

[*] Honorable Douglas H. Ginsburg, United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

2

# I.

In August 2011, M&M entered into a contract to buy from the Mazzoni Trust a plot of land that M&M planned to develop into a shopping center. M&M is a New Jersey Limited Liability Company the two members of which are also Limited Liability Companies, to wit, JMP at Hagan Ranch, LLC, and JSM at Hagan Ranch, LLC. JMP's only member is the Joseph Marino Family Trust, of which Joseph Marino is the sole trustee, and the beneficiaries of which are Marino's minor children. JSM's two members and owners are Jack Morris and Sheryl Weingarten.



The contract provided a "contingency period" of six years for M&M to secure the necessary permits and approvals for its proposed development. The purchase price was $5 million, with a potential increase based upon the projected future revenue of the property once developed.

M&M alleges, and the Mazzoni Trust disputes, that the land sale contract allowed M&M to close the sale at any time prior to the expiration of the six-year contingency period. The Trust argues the provision of the contract increasing the price based upon revenue from M&M's development of the land indicates M&M had to secure the necessary permits and approvals before it could close the sale.

M&M alleges that from 2011 through 2017 it expended substantial sums to secure the permits and approvals necessary to develop the land. Meanwhile, it says the Mazzoni Trust received a better offer for the land and, in pursuit of that offer, attempted to avoid closing on its contract to sell the property to M&M. The Trust acknowledges, and the district court found, that the Trust attempted to withdraw from the contract in 2013 because it did not want to do business with M&M after M&M failed to file progress reports on its development of the property and Morris and Marino had sued it over an unrelated matter. For his part, William Mazzoni admits he removed from the property official notices of public meetings as well as "for lease" signs and on one occasion refused to sign documents related to M&M's

4

efforts to get needed permits.[1] M&M further alleges that, having secured the necessary approvals, in May 2017 it notified the Trust of its desire to close the sale that October. According to M&M, in June the Trust refused to close on the grounds that the notice was deficient and that M&M had failed to complete some of the contingencies under the agreement.

M&M then sued the Trust for specific performance and damages for breach of the contract of sale and sued William Mazzoni seeking damages for his allegedly tortious interference with that contract. All three parties moved for summary judgment.

The district court held M&M failed to make out a prima facie claim for specific performance or damages for breach of contract because it had not shown it was ready, willing, and able to perform under the contract. More specifically, the court held evidence that Messrs. Marino and Morris had funds available for the closing was not sufficient to establish that M&M, the actual purchaser, had the funds necessary to close. The district court also held that under the circumstances, William Mazzoni, as the agent for a party, could not be liable for tortious interference with the contract; given the Trust's business reason for no longer wanting to close on the contract – namely, Marino and Morris's unrelated suit

---

[1] M&M was able nonetheless to get the necessary permits because the contract of sale appointed M&M as Mazzoni's "authorized signatory."

against the Trust – he cannot be said to have acted solely out of malice, as required by Florida law.  Accordingly, the district court entered summary judgment for both the Mazzoni Trust and William Mazzoni.  For the reasons below we affirm.

## II.

We review a grant of summary judgment *de novo*, drawing reasonable inferences in favor of the non-moving party, here the Plaintiff M&M.  *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005).  The substantive law governing this diversity case is that of Florida.

## A.

To establish a prima facie claim for specific performance of a contract or for damages for breach of a contract, Florida law requires the plaintiff to show it was ready, willing, and able to perform the contract.  *See, e.g., Hollywood Mall, Inc. v. Capozzi,* 545 So. 2d 918, 920 (Fla. Dist. Ct. App. 1989); *Lusigman v. Lusigman*, 972 So. 2d 1076, 1077–78 (Fla. Dist. Ct. App. 2008).  A purchaser may show it is financially ready and able by showing it has (1) the necessary "cash in hand," (2) "personal[] possess[ion] of assets . . . and a credit rating" that show a "reasonable certainty to command the requisite funds," or (3) "a binding commitment . . . by a financially able third party."  *Capozzi*, 545 So. 2d at 920–21 (emphasis omitted).  It is undisputed that M&M, the purchaser in this case, had neither (1) the necessary

6

$5 million of cash in hand nor (2) assets and a credit rating sufficient to command that sum. Therefore M&M's only hope is to show it had (3) a binding commitment from a financially able third party.

M&M argues that it was ready, willing, and able to perform under the contract, first, because Morris and Marino could command credit from a bank in excess of $5 million and, second, because Morris and Marino each had over $5 million in cash. As M&M is relying upon the resources of third parties, namely Morris and Marino, to show it was ready, willing, and able to close, M&M's arguments properly go to the third possible showing, i.e., that it has a binding commitment from a financially able third party. M&M argues that its principals' personal resources are sufficient to show the company had a "reasonable certainty" of being able to complete the purchase, but this falls short of the "binding commitment" the law requires. *Capozzi*, 545 So. 2d at 920-21 (emphasis omitted).

Mere possession of funds by Morris or Marino does not establish that either man had made a binding commitment – or, indeed, any commitment – to lend or give those funds to M&M in order to close the deal. M&M relies upon Marino having been the trustee and Morris a member-owner, respectively, of the two members of the purchasing LLC, M&M, but to no avail. In *Capozzi*, a company was held unable "to perform when its only ability [was] derived from funds not within its control and subject to the gratuitous payment by another." *Id.* at 920. In

7

that case, the non-binding commitment by Capozzi, chairman of the board of the purchasing corporation -- which was wholly owned by his children -- to provide funds to close the transaction was insufficient to establish the purchasing company's ability to "command" the requisite funds. *Id.* at 919–20. It necessarily follows that in this case, where there is no commitment from Morris or Marino, M&M was not ready, willing, and able to close the purchase.

M&M argues the lack of binding commitment was "only part of the court's analysis" in *Capozzi*; it went on to consider Capozzi's financial ability to close the transaction, which it found wanting. In contrast, Morris and Marino say they "confirmed" that they each possessed sufficient funds to close the sale. M&M argues the ability of Marino and Morris to command the necessary funds satisfied the more flexible standard the Florida Supreme Court set out in *Perper v. Edell*, where it said a purchaser need not be "standing outside of the office door with all the cash in hand" but should be considered financially able if it can "command the necessary money to close the deal on reasonable notice." 35 So. 2d 387, 391 (Fla. 1948).

M&M once again, however, fails to explain how it, as the purchaser of the property, could "command" the funds of Marino or Morris, neither of whom had made a binding commitment to provide those funds. Although both gentlemen undeniably have an interest in M&M's business, their legal relationship to M&M is

8

mediated through two limited liability companies and a trust. As the district court pointed out, if the situation were reversed and the Trust were suing M&M for specific performance and damages, it clearly would be inappropriate to pierce those corporate veils; so too is it inappropriate to disregard the corporate forms Marino and Morris used here to insulate themselves from the would-be corporate purchaser. *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2015) (citation omitted) ("[A] corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties.").

M&M's failure to show it was ready, willing, and able to perform under the contract is fatal to its claims for damages and specific performance under the contract. Therefore, we do not need to address the Trust's argument that the contract terminated before M&M satisfied the conditions precedent to closing.

**B.**

We turn now to M&M's claim against William Mazzoni for tortious interference with its contract to purchase land from the Mazzoni Trust. In response, Mazzoni points out that under Florida law neither a party to a contract nor its agent can be held liable for interfering with his own contract. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) ("Under

9

Florida law, a claim for tortious interference with contract cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party"); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385-86 (Fla. Dist. Ct. App. 1999) (holding a party's agent cannot tortiously interfere because "the interfering defendant must be a third party, a stranger to the business relationship"); *see also Walter v. Jet Aviation Flight Servs.*, No. 9:16-CV-81238, 2017 WL 3237375, at *8 (S.D. Fla. July 31, 2017); *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014).

In this case William Mazzoni signed the contract as a trustee of the Mazzoni Trust and acted as the agent of the Trust. Given the Trust's economic interest in terminating the contract, demonstrated by its 2013 effort to end the deal, William Mazzoni's attempts to thwart the contract were not actions taken out of malice alone, or solely for ulterior purposes. William Mazzoni cannot, therefore, be held liable for tortious interference with the contract.

## C.

M&M next argues its claim for tortious interference with contract will lie against Mazzoni because he comes within an exception for a party or agent who used "improper means" to thwart the contract, *Ethyl v. Balter*, 386 So. 2d 1220, 1225 (Fla. Dist. Ct. App. 1980), here referring us to various things Mazzoni did to

10

frustrate M&M's efforts to get the permits it needed.  Mazzoni responds that, because M&M never advanced the "improper means" exception in the district court, the issue has been forfeited and cannot be raised on appeal.  M&M replies that it raised the issue in the district court by citing caselaw applying it.

Resolving this dispute over forfeiture would require the court to decide whether the improper means exception is a "new issue" and therefore forfeit, or is merely a "new argument" for why M&M should win on the issue of tortious interference, and therefore properly before us.  *See in re Home Depot*, 931 F.3d 1065, 1086 (11th Cir. 2019) ("There is a difference between raising new issues and making new arguments on appeal.  If an issue is properly presented, a party can make any argument in support of that issue.") (cleaned up).

We need not, however, engage in that line-drawing exercise because the improper means exception is totally inapposite to this case.  As mentioned in Part II.B, Mazzoni acted as an agent of the Trust.  Indeed, for the purposes of this case, Mazzoni basically *is* the trust. Dist. Ct. Op. at 16 ("[T]he crux of Plaintiff's position is that Defendant Mazzoni essentially tortiously interfered with himself").  M&M concedes as much.  Br. of Appellant at 27 ("We do not challenge here the trial court's decision that Mr. Mazzoni's interest as trustee was equivalent to an interest in the trust's contract").  The improper means exception simply does not apply to the agent of a party to the contract.

11

Under Florida law, a person with "any beneficial or economic interest in, or control over," a contractual relationship is not considered a "stranger" to the contract and therefore has a "privilege to interfere" in that relationship. *Hamilton*, 6 F. Supp. 3d at 1320. Being neither a contracting party nor someone acting on behalf of a party, such a person is aptly described as an "interested third party." *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009). The rationale for the privilege is to allow interested third parties to interfere to "protect their own economic interests." *Hamilton*, 6 F. Supp. 3d at 1320; *see also Palm Beach Cty.*, 13 So. 3d at 1095. The improper means doctrine is an exception to this broader privilege. *See Ethyl*, 386 So. 2d at 1225 ("So long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable") (cleaned up and footnote omitted). This exception does not affect the core rule that a tortious interference claim does not lie against an agent acting within the scope of his agency, which stems from the bedrock understanding that a contracting party is never liable for interfering with its own contract. While interested third parties are not complete strangers to the contract, holding them liable for interference when they use improper means is consistent with this fundamental understanding because, unlike agents, they are not identified with the contracting parties themselves.

12

All the cases M&M cites for the improper means argument concern interested third parties rather than agents acting on behalf of a contracting party. For example, in *KMS Restaurant Corp. v. Wendy's International, Inc*., Wendy's claimed a privilege to interfere with KMS's purchase of franchise restaurants from Citicorp because it was the franchisor and the purchase contract was conditioned on its approval.  361 F.3d 1321, 1322, 1325-27 (11th Cir. 2004).  The other cases are no different.  *See Ethyl*, 386 So. 2d 1221-23 (interference by creditor with agreement between officer of bankrupt corporation and  his financier); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526 (11th Cir. 1985) (interference by developer of a lodge with management company's relationships with company's employees and unit owners); *Bluesky Greenland Env't. Sols., LLC v. 21st Century Planet Fund, LLC*, 985 F. Supp. 2d 1356 (S.D. Fla. 2013) (interference with distributorship agreement by competing distributor); *Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926 (Fla. Dist. Ct. App. 1998) (interference by landlord with lessee's proposed sale of lease); *McCurdy v. Collis*, 508 So. 2d 380 (Fla. Dist. Ct. App. 1987) (interference by Exxon with relationship between welding subcontractor's employee and his employer).  By contrast, the facts of *Salit* illustrate that interference liability based on improper methods does not apply to agents of a party.  The court held a corporate employee's interference claim against the corporation's general counsel for inducing the termination of his employment

was not adequately pleaded unless the employee added allegations that the general counsel was not acting in the corporation's interests, even though the general counsel allegedly engaged in fraudulent misrepresentation. *Salit*, 742 So. 2d at 383, 385-86; *see also Hurchalla v. Lake Point Phase I, LLC*, 278 So. 3d 58, 67 (Fla. Dist. Ct. App. 2019) (noting fraudulent misrepresentation is "ordinarily a wrongful means of interference").

M&M's improper-methods claim is effectively an attempt to impose tort liability on Mazzoni for the Trust's breach of its own contract. This effort is in direct contradiction to the principle that a party to a contract cannot tortiously interfere with that contract. Subjecting a contracting party to interference liability would convert breach of contract into a tort, which is clearly impermissible. *See Am. Int'l Land Corp. v. Hanna*, 323 So. 2d 567, 569 (Fla. 1975) ("[A] breach of contract cannot be converted into a tort merely by allegations of malice"). Tort damages cannot be given for conduct in violation of a contract with the plaintiff unless that conduct constitutes an independent tort. *Nicholas v. Miami Burglar Alarm Co.*, 339 So. 2d 175, 178 (Fla. 1976) ("Punitive damages are not recoverable for breach of contract, irrespective of the motive of defendant except where the acts constituting a breach of contract also amount to a cause of action in tort").

In this case, there is no independent tort for which the Trust or Mazzoni could be held liable. The allegedly improper nature of Mazzoni's interfering acts is based entirely on the claim that those acts violated the Trust's contractual obligations to M&M. Mazzoni allegedly refused to sign approval documents for M&M's permits, removed "for lease" signs from the property, and told people that the sale would never close, but none of these actions were criminal or contrary to any non-contractual right of M&M. Indeed, M&M could not even prove that the Trust breached its contract by these actions. Imposing tortious interference liability on Mazzoni, therefore, would be even more illogical than holding a breach of contract tortious—it would hold actions tortious that did not even amount to a breach.

### III.

For the foregoing reasons, we agree with the decision of the district court granting summary judgment in favor of William Mazzoni and the Mazzoni Trust. If the result seems formalistic, that is only because the court is bound to give effect to the corporate forms through which the plaintiff and its privies chose to contract. The judgment is, therefore,

**AFFIRMED**.

15