Elizabeth Duda **KLOHA, individually and on behalf of A. Duda & Sons, Inc., Plaintiff,**

v.

**Edward D. DUDA, Ferdinand S. Duda, Clark Daugherty, R. Ray Goode, Allan R. Nagle, William W. Heintz, And A. Duda & Sons, Inc., Defendants.**

**No. 6:01–CV–1371–ORL–31JGG.**

United States District Court, M.D. Florida, Orlando Division.

Feb. 14, 2003.

Stephen D. Busey, James Arthur Bolling, Smith, Hulsey & Busey, Jacksonville, FL, for plaintiff.

Julie M. O'Daniel, Theodore Joseph Sawicki, Alston & Bird, LLP, Atlanta, GA, Darryl M. Bloodworth, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, FL, for defendants.

### ORDER

PRESNELL, District Judge.

This cause comes before this Court for consideration on:

1) Defendant Ferdinand S. Duda's Motion for Summary Judgment and, in the Alternative, for Judgment on the Pleadings (Doc. 71), F.S. Duda's Memorandum in Support (Doc. 72), and Plaintiff's Opposition (Doc. 121) thereto; and

2) Defendants', Edward D. Duda, Ferdinand S. Duda, Clark Daugherty, R. Ray Goode, Allan R. Nagle, William W. Heintz, and A. Duda & Sons, Inc., Motion for Summary Judgment (Doc. 73), Defendants' Memorandum in Support (Doc. 74), and Plaintiff's Opposition (Doc. 122) thereto.

The Court heard oral argument on January 30, 2003.

## I. Background

In 1926, Andrew Duda began farming celery in central Florida, thus starting the family-owned and family-operated company that would become A. Duda & Sons, Inc. ("Duda" or the "Company"). Andrew Duda had three children—Ferdinand, Andrew Luther ("Andrew L. Sr."), and John—all of whom worked for the Company and are otherwise known as "the Three Seniors." In 1953, Duda incorporated, with each of the Three Seniors owning equal shares of the stock. Subsequently, two of the Three Seniors (John and F.S. Duda) joined together to exercise majority control of the Company, and Andrew L. Duda Sr., thus became the minority shareholder. Plaintiff Elizabeth Duda Kloha hails from the Andrew L. Duda Sr. family line.

While vegetables has remained the Company's core business, it has diversified over time into other areas of business, including citrus, real estate, sod, sugarcane, and cattle. In 1996, the Company employed 1,013 full-time workers, with 25 of those employees coming primarily from the third and fourth generations of the Ferdinand and John Duda family lines. Out of those 25 family employees, seven worked directly in the vegetable business, and one worked in citrus.[1] Duda reduced the number of full-time employees to 859 in 1999, with six family members in vegetables, and one in citrus. Plaintiff never has worked for the company.[2] Defendant Ferdinand S. ("F.S.") Duda (Ferdinand family line) is currently the President and CEO of the Company and serves on the Board of Directors. Defendant Edward Duda (John family line) worked for the Company from 1957 until 1998, but today serves only as Chairman of the Board.

In 1989, a consultant suggested that Duda restructure its seven-member Board of Directors so that a majority of the directors hailed from outside the family. That same year, on November 10, 1989, a majority of Duda's signing shareholders,[3] entered a ten-year Voting Trust Agreement (the "Trust").[4] Under this Trust, the signing shareholders transferred their voting rights to the co-trustees, Defendants John[5] and F.S. Duda. According to the Trust, the co-trustees were to vote on behalf of the signing shareholders in accordance with the wishes of the majority of Trust shareholders. (Trust at ¶ 5). The current Board has each of the Three Sen-

1. Plaintiff does not contest the number of family members directly involved in vegetables but notes that most of the other family employees held corporate overhead positions that predominantly supported vegetables and citrus. Moreover, Plaintiff does not assert that the Company should have hired more members from her family line.

2. Plaintiff worked part-time at Duda during one summer when she was in college; her husband never did. (Doc. 93 at 14). Plaintiff has not attended Board meetings in person,

though they have been attended for her by proxy. (*Id.* at 147–48).

3. None of the Andrew L. Sr. family line participated in the Trust.

4. A true and correct copy of the Trust was attached as Exhibit 1 to Defendant F.S. Duda's Memorandum in Support of Summary Judgment (Doc. 72).

5. John Duda, who is employed by Duda, hails from the John Duda family line.

iors' family lines represented by two family members.[6]

The six Defendant Directors[7] were voted onto the Board at various times while the Trust was in place. The Trust was dissolved in mid–1999. At each of the shareholders' meetings held since the Trust's dissolution, a simple majority of shareholders have voted for these same six Defendant Directors.

During the 1990s, Duda experienced financial difficulties due to the volatile nature of the vegetable and citrus industries. As a result, the Company's financial records showed substantial losses, and Duda was unable to pay dividends to its shareholders on an annual basis. Concerned with this volatility and loss, the Board of Directors discussed ways to reduce risk and improve profits. Over the course of several years, the Directors implemented several strategies, including: 1) increase handle deals in which Duda would sell crops grown by other companies; 2) enter into contracts with large national retailers, such as Wal–Mart, to provide an established supply of produce at a set price; 3) diversify both business-wise (by expanding certain sod, sugarcane, cattle, and real estate operations in the 1990s), and geographically (by increasing vegetable operations in Texas and California); and

4) redeploy, divest, reorganize, and sell certain vegetable, citrus, and real estate assets to reduce debt, respond to cash-flow deficits, and focus on more profitable operations.

On September 26, 2001, believing these actions to be inadequate, Plaintiff demanded that the Company either purchase the minority shareholders' interests or initiate a shareholder derivative suit. On November 2, 2001, Plaintiff again requested the filing of a derivative suit. In response, the Company ordered an independent investigation of Plaintiff's allegations, but found in its Special Litigation Committee Report that the claims were meritless and that a derivative suit was not in the Company's best interests.

On November 21, 2001, Plaintiff filed this action, bringing Counts I and II derivatively on behalf of Duda, and Count III individually. In Count I, Plaintiff alleges that F.S. Duda breached the Trust by electing a Board of Directors he knew would agree with him and would not sell the vegetable and citrus operations, which employed members the Ferdinand and John Duda family lines. In Count II, Plaintiff alleges that the Defendant Directors breached their fiduciary duties as corporate directors by failing to exit the losing vegetable and citrus operations. In

**6.** The Company's Bylaws also were amended in June 1997 to provide for a ten-person, rather than a seven-person, Board in which six directors would come from the three Duda family lines, and the remaining four would come from outside the family. As a result of that Amendment, each family line, which previously held one director spot each, was allowed to nominate a second family director. Those six family members then would decide upon a full slate of directors to be voted upon by the shareholders at the annual meetings. The Ferdinand and John family lines nominated their second director per the Amendment. The Andrew L. Sr. line elected not to take advantage of its opportunity to double its representation on the Board.

Also in 1997, the family attempted to mediate an agreement to buy out the minority shareholders' stock.

**7.** Defendant Directors include six of the ten current directors on Duda's Board. The six Defendant Directors are Edward D. Duda, F.S. Duda, Clark Daugherty, R. Ray Goode, Allan Nagle, and William W. Heintz. Of these directors, only Edward and F.S. Duda are members of the Duda family; the others are considered "outside directors." Andrew L. Duda Sr. also was on the Board during the relevant time frame, but is not being sued.

Count III, Plaintiff also alleges that F.S. Duda breached the Trust, but brings the claim on behalf of herself as an individual shareholder.

## II. Standard of Review

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the record presents factual issues, the court must not decide them, but rather, must deny the motion and proceed to trial. *Environmen-*

tal Def. Fund v. Marsh, 651 F.2d 983, 991 (5th Cir.1981).[8]

## III. Analysis

### A. Count I—Derivative Claim of Breach of Trust

Plaintiff argues that F.S. Duda[9] breached his Trust duties to all shareholders by purposefully electing a Board of Directors who would agree not to exit unprofitable operations in order to continue employment of Duda family members.

A court cannot interfere with a trustee's actions pursuant to a trust agreement unless the actions were arbitrary, in bad faith, or outside of the trust's authority. *In re Moir Hotel*, 186 F.2d 377, 382 (7th Cir.1950) ("So long as a trustee is exercising discretionary powers conferred upon him, honestly and reasonably, a court . . . has no right to interfere."); *Scott v. Arden Farms Co.*, 28 A.2d 81 (Del.Ch.1942)[10] (holding that voting trust certificate holders[11] were bound by the voting trustees' acts if those acts were done in good faith and within the scope of their authority). The Court cannot stray from the plain terms of the Trust. *Warehime v. Warehime*, 563 Pa. 400, 761 A.2d 1138 (2000) (reversing lower court for straying from the requirements set forth in the plain terms of the trust agreement). Here, the terms of the Trust limited the scope of F.S. Duda's authority as co-trustee to vote the shares deposited pursuant to the Trust

---

**8.** All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**9.** Plaintiff elected to sue only F.S. Duda, rather than both F.S. and John Duda as co-trustees, because she claims that F.S. Duda was the controlling trustee.

**10.** *In re Southeast Banking Corp.*, 855 F.Supp. 353, 359 n. 4 (S.D.Fla.1994) (Florida courts

may rely on Delaware law to construe Florida's corporate doctrines); *accord Connolly v. Agostino's Ristorante, Inc.*, 775 So.2d 387, 388 n. 1 (Fla. 2d DCA 2000).

**11.** The Court recognizes that Plaintiff here is not a Voting Trust Certificate Holder, but that fact does not render the holding of the *Scott* case—that a court will not disturb a trustee's good faith acts done within the scope of his authority—inapplicable to the case at bar.

"in accordance with the direction of the holders of Trust Certificates not representing less than a majority of the shares deposited hereunder." (Trust at ¶ 5(i)). Thus, F.S. Duda had no discretion to vote in a particular way, but in fact was obligated to vote as the majority wished. The only semblance of discretion afforded to F.S. Duda as co-trustee was a directive to exercise "reasonable care." (*Id.* at ¶ 10).

Plaintiff has cited no evidence demonstrating that F.S. Duda voted in any manner other than the manner that the majority of the Trust Certificate Holders wished, as required by the plain terms of the Trust. Plaintiff also has not produced any evidence that F.S. Duda acted unreasonably, fraudulently, or in bad faith in violation of the Trust's terms or applicable case law. Plaintiff claims there is "record evidence" of F.S. Duda's bad faith and purposeful mismanagement, but the "evidence" she cites includes only conclusory statements that F.S. Duda purposefully elected a "yes men" Board.[12] Such unsubstantiated, conclusory allegations are in-

sufficient[13] to survive summary judgment.[14] *Moir Hotel,* 186 F.2d at 382 (a court will not interfere with the exercise of a trustee's powers absent proof of fraud, bad faith, or abuse of discretion).

### B. Count III—Direct Claim of Breach of Trust

▮ Plaintiff asserts that she has standing[15] to bring a direct claim against F.S. Duda for breach of trust because under the terms of the Trust, F.S. Duda owes her, as a shareholder, a fiduciary duty. The Court notes, however, that the law is well-established that if a plaintiff sues in a stockholder capacity for corporate mismanagement, she must sue derivatively in the corporation's name. *Empire Life Ins. Co. of Amer. v. Valdak Corp.,* 468 F.2d 330, 335 (5th Cir.1972). Plaintiff argues that because the Trust explicitly names all shareholders as beneficiaries that she falls into the one exception to the rule regarding derivative suits. That one exception allows an individual to sue on her own

---

**12.** Plaintiff cites, for example, the deposition of her sister, Dorothy Wise, who states: "I think [the Directors] purposefully accommodated Ferdinand's wishes." (Doc. 98 at 48), and "If they considered [getting out of vegetables], I know that Ferdinand would stonewall that, that he does not want us to ever get out of vegetables." (*Id.* at 56).

**13.** In fact, the record establishes the opposite. First, the Directors continued to vote for the same Board for several years after the Trust's dissolution in 1999. Second, F.S. Duda did not support only a "yes men" Board, for in 1999, he nominated Bruce Hrncir, who, prior to the nomination, regularly voiced objections to and voted against F.S. Duda in shareholder meetings.

**14.** Plaintiff claims that F.S. Duda has put forth a "Nuremberg" defense by ignoring his duty to resign as fiduciary. In support, Plaintiff cites *In re Kitchen Factors,* 143 B.R. 560 (9th Cir.BAP 1992), which held that an attorney should seek to withdraw or recommend the client to obtain a second legal opinion

where the trustee/debtor-in-possession continues to pursue efforts to collect a debt in a non-cost effective manner. *Id.* at 562–63. Not only are the facts in that case wholly dissimilar to the facts at bar, but the holding also has no bearing on this shareholder's breach of trust claim against a corporate director. *Kitchen Factors* in no way compels the result that F.S. Duda should have resigned as fiduciary, and in fact, the Court does not see how the case has any relevance to the instant matter.

**15.** Plaintiff claims—without any legal support—that F.S. Duda waived any lack-of-standing defense to bring Count III directly. The Federal Rules of Civil Procedure do not require a party to plead a lack-of-standing defense with particularity, as Plaintiff asserts. Thus, Defendant's blanket affirmative defense stating that "Plaintiff does not have standing to bring the claims asserted ..." is sufficient to plead the affirmative defense of standing.

behalf if she: a) is not similarly situated to other shareholders; b) suffers a distinct injury—i.e., special damages—from the other shareholders; and c) does not have the same opportunity to be made whole by a corporate recovery. *Citibank v. Data Lease Fin. Corp.*, 828 F.2d 686, 693 (11th Cir.1987). Plaintiff must show, therefore, that she seeks to enforce a right of action unique to her, rather than address an injury mainly to the corporation, or to the whole body of its stock. *Hodges v. Buzzeo*, 193 F.Supp.2d 1279, 1288 (M.D.Fla. 2002).

In support, Plaintiff relies primarily on *Salit v. Ruden, McClosky*, 742 So.2d 381 (Fla. 4th DCA 1999), in which the court held that an injurious falsehood count properly was brought as a direct claim. *Id.* at 389. Salit, however, does not help Plaintiff's case, for the direct claim in *Salit* was proper only because those plaintiffs allegedly suffered property damages unique to themselves and distinct from the other shareholders. *Id.* Thus, those plaintiffs did not sue the majority shareholders for decreased value of stock but rather for their personal property interests. *Id.*

Plaintiff in the instant case does not claim to enforce any personal property interests distinct from other shareholders but rather claims that her damages were distinct because, unlike family shareholders who were employed by Duda, she did not receive compensation and benefits from the Company.[16] The fact that certain family shareholders are employees and thus receive compensation does not, however, distinguish Plaintiff as a shareholder for purposes of her damages suffered in relation to other shareholders. By her own implication, Plaintiff admits that the family employees at Duda have suffered the same stock value decline, and would have suffered the same stock decline with or without their employment. For this reason, Plaintiff has failed to show that her damages are distinct from those of any other shareholder. Rather, she has demonstrated only injury to the corporation that indirectly affected her as a shareholder. Such indirect injury is insufficient to maintain a direct claim for breach of trust. *Hodges*, 193 F.Supp.2d at 1289 (requiring a counterclaim to be brought as a derivative action unless the counterclaimant could show direct injury). Accordingly, Plaintiff cannot bring this claim on her own behalf, and summary judgment also is appropriate as to Count III.[17]

**C. Count II—Derivative Claim of Breach of Fiduciary Duty**

Defendant Directors move for summary judgment on Count II, asserting that the business judgment rule shields them from liability.[18] Under the business

**16.** Specifically, Plaintiff asserts that where F.S. and Edward Duda cushioned their decline in stock value by substantial income resulting from employing themselves and their family members, Plaintiff and her immediate family bore the full burden of her stock's decline in value. It is of no relevance for a breach of trust claim, but the Court notes that Plaintiff admitted she never sought to or wanted to work for Duda. (Doc. 93 at 15).

**17.** This Court's decision is supported by the policy behind derivative actions: "If each shareholder could sue individually for his losses, the wrongdoer would be subject to 'as many suits ... as there were stockholders in the corporation.'" *Empire Life Ins. Co. of Amer.*, 468 F.2d at 335. Indeed, in her deposition, Plaintiff testified that she hopes to recover losses that she personally suffered as a shareholder, i.e., her eight percent share of the Company. (Doc. 93 at 106).

**18.** Plaintiff asserts that based on Florida Statute § 607.0831(1)(b)(4), the Court must resolve whether the Defendant Directors acted with conscious disregard for the Company's interests before determining whether those Directors are protected by the business judgment rule. This statement is not true. Rath-

judgment rule, a court presumes that corporate directors acted in good faith. *In re Bal Harbour Club, Inc.*, 316 F.3d 1192 (11th Cir.2003);[19] *Cottle v. Storer Comm., Inc.*, 849 F.2d 570, 574 (11th Cir.1988). The rule prevents a court—which may possess less business expertise than the corporate directors—from calling upon directors to account for their actions, no matter how poor their business judgment, absent a showing by the plaintiff of abuse of discretion, fraud, bad faith, or illegality. *Bal Harbour Club*, 316 F.3d at 1192; *Cottle*, 849 F.2d at 575. The rule also prevents a factfinder from using hindsight to second-guess directors' business decisions. *Bal Harbour Club*, 316 F.3d at 1192 (citing *F.D.I.C. v. Stahl*, 89 F.3d 1510, 1517 (11th Cir.1996)).[20]

Plaintiff claims that the Defendant Directors breached their fiduciary duties by: 1) making decisions based on family employment concerns; 2) failing to exit the historically and predictably unprofitable vegetable and citrus operations; and 3) selling assets to fund the operating losses of vegetables and citrus.

### 1) Family Employment

■ Plaintiff claims that Defendant Directors caused the Company to remain in the losing operations of vegetables and citrus because they were beholden to F.S. Duda, who wanted to ensure continued family employment. In support of this claim, Plaintiff cites Larry Singleton's testimony, Minutes from both Shareholders' and Board of Directors' Meetings, and an Interview Summary by the Special Litigation Committee, as identified in detail below.

### a) Larry Singleton's Testimony

When Larry Singleton—who has been submitted to this Court as an expert for Plaintiff[21]—was serving as a consultant to

---

er, the Court initially must determine whether the business judgment rule applies by assessing whether there is evidence of bad faith, abuse of discretion, fraud, or illegal acts. The Court only needs to apply the conscious disregard standard if the business judgment rule is overcome and liability is asserted against corporate directors in a personal capacity. *Connolly v. Agostino's Ristorante, Inc.*, 775 So.2d 387, 388 (Fla. 2d DCA 2000) (noting that Florida Statute § 607.0831 "neither imposes any duties on corporate directors nor creates any causes of action against them.").

**19.** "In using the word 'presumption' ... in articulating the business judgment rule, the courts have not intended to create a presumption in the classical procedural sense.... Rather, the courts are merely expressing the substantive rule of director liability." *Bal Harbour Club*, 316 F.3d at 1192.

**20.** The case law—such as *Stahl*—remains unclear as regards the complete relationship between the business judgment rule and Florida Statute § 607.0830. That statute provides that:

A director shall discharge his or her duties as a director, including his or her duties as a member of a committee: (a) In good faith; (b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) In a manner he or she reasonably believes to be in the best interests of the corporation.

Although addressing that statute in various contexts, including non-derivative claims, the courts appear to read the three prongs of the statute—good faith, due care, and acting in the company's best interests—in the conjunctive when applying the business judgment rule. That is, in order to find liability, a plaintiff must establish not just that the corporate directors acted negligently—as in prong (b) of the statute, *Stahl*, 89 F.3d at 1517—but rather a plaintiff must show the directors acted negligently, *and* in bad faith, *and* in a manner not reasonably believed to be in the company's best interests. The business judgment rule thus appears to be in harmony with the statute.

**21.** Defendants moved this Court *In Limine* to preclude Singleton from testifying at trial for several reasons. Specifically, Defendants claimed that Singleton improperly would

the Company, he heard outside director Clark Daugherty say at a 2000 Board meeting:

> There is nothing that you're saying that's rocket science. We've considered these alternatives before, but there are family considerations. If it weren't for the family, we probably wouldn't be in vegetables at all.

(Doc. 118, Pl.'s Ex. 23, at ¶ D; *see also* Doc. 94 at 225). Singleton testified that after Daugherty made this statement, no Board member disagreed. (Doc. 94 at 226–228).

In this same report, Singleton also claimed that when discussing termination or reorganization of unprofitable operations, F.S. Duda responded, "if Duda family members couldn't work in the business, [I] might as well sell it." (Doc. 118, Pl.'s Ex. 23, at ¶ E; *see also* Doc. 94 at 229–32).

### b) January 1997 Shareholders' Meeting Minutes

Plaintiff testified that family, rather than business, concerns drove the Defendant Directors' decisions. (Doc. 93 at 99–101). Plaintiff cites an Overhead Cost Re-

duction Committee report, saying it "is not looking at family members" when implementing cost reductions. (Doc. 83, Tab 17, at 7).

### c) Minutes from Board of Directors' Meeting of June 4, 1992

Plaintiff points out that the Minutes from a Board of Directors' Meeting list as one of six rationales for continuing to participate in the vegetable business, "More than half a dozen Duda family members have interesting and challenging jobs in the fresh market business." [22] (Doc. 82).

### d) Special Litigation Committee Interview Summary

According to a Special Litigation Committee Interview Summary, Dorothy Wise [23] said that "citrus and vegetables were 'Ferdinand's baby,'" and that " 'If I and my children can't have jobs in this family what do I need Duda for?' " (Doc. 123 at 2).

### e) Sufficiency of the Evidence

Plaintiff has not produced evidence sufficient to overcome the presumption that the

---

opine on an ultimate issue if the Court permitted testimony that the Defendant Directors breached their fiduciary duties by failing to sell the losing citrus and vegetables operations. For example, Plaintiff proposed to submit Singleton's testimony that:

> I think it was a breach of their fiduciary duty to not have actually been out by the end of '95. There was adequate evidence in the earlier years, going back seven years, of what was going on there.... They should have seen it. It was predictable and they should have done something about it so they never would have suffered the losses from '96 through '99.

(Doc. 94 at 260–61).
Without ruling on Defendant's Motion *In Limine,* the Court notes that it will not here consider this or any other part of Singleton's testimony regarding such ultimate conclusions.

**22.** The other five listed rationales were: 1) the Company's strategic capabilities lay in production and marketing of fresh market product; 2) expectation of continued market growth due to health-conscious aging population and reduced competition; 3) short-term and long-term cost competitive production locations; 4) ties between the fresh citrus and fresh vegetable business; 5) fresh vegetable business provides operating capital for other divisions during fiscal year. (Doc. 82).

**23.** Dorothy Wise never worked for the Company. Her husband worked there for only a summer or two during college, about three decades ago. (Doc. 98 at 28). She has attended most Board meetings from 1989 to the present. (*Id.* at 38).

Defendant Directors acted in good faith. This Court will not substitute its judgment where the Board's decisions can be attributed to rational business purposes. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985).

Directors may, under Florida law, consider how a business decision will affect employees. Fla. Stat. § 607.0830(3). Here, the record establishes that Defendant Directors properly considered impact on employees, including family members, as one of many factors. (*See, e.g.*, Doc. 90 at 85: "We looked at all our employees to see whether we needed them or not, family included."). No Director, including F.S. Duda himself, disputes that F.S. Duda felt strongly about family employment as an important facet to this family-run business. (*See, e.g.*, Doc. 97 at 158; Doc. 90 at 103, 106). However, there is no evidence that F.S. Duda continued operating the vegetable and citrus businesses solely or even primarily to employ his family members. Plaintiff also has produced no evidence that the family employees lacked qualifications, received unreasonable compensation, or enjoyed undue advantage. In fact, the record shows the opposite. The family employees' compensation was reasonable and consistent with the pay for similar positions in the market.[24] In addition, Plaintiff's accusation makes no sense economically, for it would be irrational for a family-run business to intentionally lose millions of dollars of shareholder value in order to sustain family employment when the employees' compensation is meager compared to shareholder dividends. (Doc.

84, Tab 22 at ¶¶ 41–44). Plaintiff has produced no evidence to show that the Defendant Directors, by continuing to employ family members, exercised bad faith, acted fraudulently or illegally, or abused their discretion.

### 2) Defendants Should Have Known to Exit Losing Operations Before 1996

■ Plaintiff asserts that the Board knew that citrus and vegetables were predictable losers or underperformers by 1995 but failed to sell those operations to the detriment of the shareholders. Plaintiff points to several pieces of evidence in support of this assertion, including Larry Singleton's testimony, Directors' discussions, depositions of minority shareholders, and certain other documents, as identified below.

### a) Singleton's Testimony

Singleton testified that, based on his analysis using the economic value added ("EVA") method,[25] citrus was a "value destructor" or underperformer and the vegetable business was a predictable loser for Duda. (Doc. 94 at 109–10). Singleton also testified, based on an analysis of the Company's financial records and allocation of expenses (or lack thereof),[26] that the Defendant Directors should have seen the downward trend in vegetables and citrus and sold or restructured those operations.[27]

---

**24.** (*See* Doc. 84, Tab 22 at ¶¶ 46–7).

**25.** The EVA method is a tool to measure a company's profitability.

**26.** Singleton claims the records show that vegetable and citrus operations lost tens of millions of dollars during the years 1989–95. Defendant Directors assert that the Compa-

ny's actual performance contradicts Singleton's figures, but the Court must consider the facts in a light most favorable to Plaintiff.

**27.** When Singleton served as a consultant to Duda, he recommended that the Board sell the vegetable and real estate businesses, not the citrus business.

### b) The Defendant Directors Often Discussed the Businesses' Volatility

Plaintiff suggests that the Defendant Directors knew that the vegetable and citrus businesses should be cut by 1995 because they often discussed the volatility and weaknesses of those businesses. In support, Plaintiff submits portions of Duda Minutes, memoranda, and reports. First, Plaintiff submitted the Minutes of the December 9, 1994, Annual Shareholders Meeting (Doc. 83, Tab 17), which stated, "Chairman [Edward] Duda ... indicated that the major problem was in vegetables, but that other areas did fairly well. [He] noted that vegetables have always been, and will continue to be, very volatile in nature...." Plaintiff did not note that this sentence continues, "but that the company has been working very hard since 1986 to diversify its holdings." (*Id.*).

Second, Plaintiff submits a June 5, 1996, Memorandum from Edward Duda to the Board of Directors (Doc. 99, Pl.'s Ex. 56), which notes, "The past ten years have demonstrated that ... fiscal 1996 will represent the fourth loss in seven years." Of course, this sentence is but one in a two-page memorandum, which goes on to discuss various studies of Duda's vegetable operations and plans to increase California vegetable operations in order to help stabilize prices and "improve our financial position."

Third, Plaintiff submits the Final Report of Vegetable Restructure Committee of July 1997 (Doc. 99, Pl.'s Ex. 3), which states, "The viability of the vegetable business has been questioned often and seriously for quite some time."

### c) Historically Unsuccessful Actions

Plaintiff claims that steps the Defendant Directors did take to address the Company's financial problems were historically unsuccessful. For example, Plaintiff offers a 1993–94 Profit Plan & Strategic Plan Review by Barton Weeks,[28] which recognized NAFTA as a threat posed to Florida agriculture but that never dealt with how to alleviate the problem. (Doc. 72, at Ex. I). Plaintiff also cites the depositions of minority shareholders. For example, Dorothy Wise testified, "I don't know that [the Directors] accomplished anything or really did anything different than they had in the past." (Doc. 98 at 47). Luther Duda testified, "They've [the Directors] gone through the motions [of taking steps to increase profitability]. They've made some changes but they are woefully inadequate." (Doc. 91[29] at 51–52). Plaintiff cites the Special Litigation Committee Report, insisting that the Defendant Directors also failed to adequately deal with environmental factors, perishability, foreign competition, pests and diseases, and diminished grapefruit consumption. (Special Litigation Committee Report at 36–37).

Finally, Plaintiff argues that because some steps—such as diversification into California and Texas and targeting large customers for contract or handle deals—were begun in the early 1990s but did not show immediate success, the Defendant Directors should have predicted by 1995 that these steps were not working and instead should have sold the relevant agribusinesses.

### d) Sufficiency of the Evidence

Rather than producing evidence that the Defendant Directors acted in bad faith,

---

**28.** Weeks is currently the CFO of Duda's real estate company, Viera. (Doc. 97 at 9). He attends Board meetings, though not regularly. (*Id.* at 12).

**29.** Luther Duda worked for the Company from 1961 until 1995, and served on the Board until it was reduced to seven members. (Doc. 91 at 8, 16).

Plaintiff has convinced this Court of the opposite, i.e., that they acted with *good faith* in contemplating how to deal with the volatile agribusinesses.[30] Indeed, the Defendant Directors not only knew about the threats and weaknesses to the agribusinesses, but they addressed them via reports, studies, discussions, and committees, and ultimately conceived of and implemented strategies and plans to reduce risks and increase profits. (*See, e.g.*, Doc. 97 at 76, 86, 117–19; Doc. 89 at 53–54, 69; Doc. 96 at 63–64, 88; Doc. 90 at 64). Consistent with Florida Statute § 607.0830(2)(a) and (b), the Board regularly requested materials from management to help guide its decisions and to arrive at a consensus of best next steps. (*See* Doc. 84, Tab. 23, at ¶¶ 4–7; *Id.*, Tab 24; at ¶¶ 2–5; Doc. 114 at ¶¶ 4–7; Doc. 108 at ¶¶ 5–8; Doc. 109 at ¶¶ 2–5; Doc. 107 at ¶¶ 2–5). The Defendant Directors, along with the rest of the Board, even discussed and contemplated the very strategy urged by Plaintiff—exiting the vegetable business. Ultimately, the Board determined that exit would not be valuable to shareholders[31] and thus decided instead to pursue long-term[32] strategies to reduce volatility, including: 1) increasing handle deals, 2) increasing contracts with national retailers, 3) diversifying, and 4) redeploying assets.[33] The fact that those strategies may not have produced immediate profits or annual dividends in no way evinces bad faith to prevent application of Florida's business judgment rule. *See, e.g., Unocal,*

---

**30.** It is not surprising that Plaintiff had to base her lawsuit only on the results of the Board's actions, i.e., loss and lack of dividends in certain years, for she and other minority shareholders admit that they did not know what actions the Board took to improve profitability of the operations at issue. (*See, e.g.*, Doc. 93 at 36–37, 161; Doc. 98 at 47). Indeed, Plaintiff admits, as she must, that it is the Board's, not the shareholders', responsibility to resolve the problems at hand. (*See, e.g.*, Doc. 93 at 91, 118). The only thing Plaintiff knew for certain was that "whatever [the Directors] tried didn't work." (*Id.* at 92). She bases her complaint on one accusation: "they did not solve the problem by cutting the losses in vegetables and citrus." (*Id.* at 158). Plaintiff even admitted that she could only speculate as to what the Board considered when they decided to stay in the vegetable business. (*Id.* at 101). Wise also admits that she was not "privileged" to what the Board used to decide whether to stay in the vegetable business, (Doc. 98 at 57) and that it is "not my job" to know what the Board could have done to improve profitability. (*Id.* at 69). Luther Duda also testified that he only knows the *results* of what the Board did, not necessarily what the Directors actually did or did not do as far as steps taken. (Doc. 91 at 34).

**31.** As Clark Daugherty testified, "You don't just go out of major parts of your business simply because they have one or two bad years, even in a row, if you feel that there's an opportunity to move forward with them." (Doc. 86 at 178). In fact, the last two years have shown profits for the Company. (Doc. 90 at 70).

**32.** Plaintiff also has shown no evidence that the Defendant Directors knew of threats and weaknesses and took actions they knew to be historically unsuccessful. First, as discussed, they did take some actions, and some directors testified that these risk-reducing changes could not have been made any faster. (*See, e.g.*, Doc. 86 at 71; Doc. 90 at 124). Second, implementing a strategy that does not produce results until five to ten years hence does not reveal bad faith.

Moreover, directors testified that "history" is not always a reliable predictor when an industry is in flux and/or a transitional period. (Doc. 97 at 133). Indeed, during the years at issue, both the vegetable and citrus industries were volatile, not just for Duda, but for all involved in those businesses. (Doc. 90 at 60; *see also* Doc. 86 at 71: "This is an industrial [sic] that is in evolution and flux and I think substantial progress has been made.").

**33.** It is of no import, as Plaintiff asserts, that the assets were not deployed in a manner to give shareholders dividends in certain years. (Doc. 93 at 120–21).

493 A.2d at 958 (holding that the board's actions were entitled to business judgment rule standards because the board acted in good faith and upon reasonable investigation); *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 384 (2d Cir.1980) (holding that the record—which revealed the directors engaged outside firms, were informed, and asked numerous questions to help them deliberate on a proposed merger—provided no adequate basis for finding lack of good faith). Plaintiff here has not overcome the presumption of the business judgment rule that Defendants acted in good faith.[34]

Moreover, Defendants did not wholly fail to allocate expenses. (*See, e.g.,* Doc. 97 at 25, 31, 41–44; *see also* Doc. 84, Tab 22 at ¶¶ 50–55). Rather, Plaintiff's own evidence shows that Duda *did* allocate, just not to the same degree or in the same manner as Singleton suggests. (*See, e.g.,* Doc. 118, referring to Overhead Allocation figures by Goldman Sachs, Lancaster, and Duda, gleaned from Pl.'s Ex. 20, 21, and 29, respectively; *see also* Doc. 97 at 42–43; Doc. 89 at 34). Even if the Court adopted Singleton's EVA allocation approach—which itself is but one method of economic analysis (Doc. 97 at 132)—which reveals significant losses, that still does not provide evidence sufficient to overcome the business judgment rule. *Bal Harbour Club.*, 316 F.3d at 1192 (directors will not be called to account for their actions, no matter how poor their business judgment, absent a showing of abuse of discretion, fraud, bad faith, or illegality).

### 3) Selling of Assets

■ Finally, Plaintiff asserts that the Defendant Directors approved asset sales in the 1990s to fund operating losses. As evidence, Plaintiff offers a Long–Range Strategic Plan adopted by the Board of Directors on November 1, 1996, and a Table from the Special Litigation Committee Report, which reflect that assets were sold to reduce debt and respond to cash-flow deficits. Plaintiff testified that the Defendant Directors should have sold the vegetable and citrus operations rather than the assets they did sell, because the vegetable and citrus operations were the ones losing money. (Doc. 93 at 95).

As above, there is no evidence that the Defendant Directors sold the relevant assets in bad faith. Defendant Directors do not dispute that they sold assets to reduce debt and to use the sales' proceeds to mitigate certain operating losses. (Doc. 97 at 68; Doc. 90 at 65–66). However, the record establishes that the Company sold these assets under threat of condemnation, as part of the Company's reorganization and disposal of under-productive assets, or simply as part of the company's consistent practice to buy and sell assets. Thus, the assets were sold based on rational business purposes, not as part of a bad-faith design to cover for operating losses. (Doc. 84, Tab 30 at ¶¶ 1–3; Doc. 84, Tab 22 at ¶¶ 34–36). Plaintiff has produced no evidence, other than conclusory statements, to the contrary.

### IV. Conclusion

There are no material facts in dispute in this case. The only dispute is the infer-

---

**34.** Although the Court need not reach the issue of conscious disregard in relation to these Defendant Directors, it notes that if it had, Defendants did not cite case law which would have served as precedent. *Coleman v. Associated Pipeline Contractors, Inc.*, 444 F.2d 737 (5th Cir.1971), a wrongful death case, construes Mississippi law regarding a contractor's duty, not a corporate director's duty. *Rommell v. Auto. Racing Club of America, Inc.*, 964 F.2d 1090 (11th Cir.1992) is a car explosion case construing Alabama law and has nothing to do with corporations or standards for corporate directors.

**1250**

ence Plaintiff seeks to draw from the facts—that Defendants acted in bad faith by not selling the Company's citrus and vegetable operations. Such an inference, however, is simply not supported by the facts. At best, Plaintiff's claims reflect hindsight judgment that the Defendant Directors could have done a better job developing and implementing different plans to address complex financial problems. Because the business judgment rule shields these Directors from liability, the Court need not reach the issue of their personal liability nor of damages. For all the foregoing reasons, it is therefore

**ADJUDGED** and **ORDERED** that Defendant's, Ferdinand S. Duda, Motion for Summary Judgment as to Counts I and III (Doc. 71) is **GRANTED,** and Defendants,' Edward D. Duda, Ferdinand S. Duda, Clark Daugherty, R. Ray Goode, Allan R. Nagle, William W. Heintz, and A. Duda & Sons, Inc., Motion for Summary Judgment as to Count II (Doc. 73) is **GRANTED.** All other pending motions are **DENIED AS MOOT.** This case is removed from this Court's April trial docket, and the Pretrial Conference scheduled for March 12, 2003, is cancelled.