DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MARLA SHARE,**
Appellant,

v.

**BROKEN SOUND CLUB, INC.,**
Appellee.

No. 4D20-1244

[March 10, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cymonie S. Rowe, Judge; L.T. Case No. 502018CA004625XXXMBAI.

Stephen J. Padula and Joshua S. Widlansky of Padula Bennardo Levine, LLP, Boca Raton, for appellant.

Dale W. Schley, II and Lora A. Esau of Laing & Weicholz, P.L., Boca Raton, and Michael C. Marsh, Ryan Roman and Eric D. Coleman of Akerman, LLP, Miami, for appellee.

GROSS, J.

Marla Share appeals the circuit court's orders granting summary judgment and entering final judgment in favor of Broken Sound Club, Inc. ("Club") in litigation over homeowner dues. We affirm the judgment and write to address issues concerning the implied covenant of good faith and the application of the business judgment rule to operational decisions of a club board when such decisions are authorized by its bylaws.[1]

---

[1] We reject appellant's claim that the 2007 implementation of the Shelly Rule, described in the opinion, was an ultra vires act. Implementation of the rule in 2007 did not require an amendment to the Club's Bylaws. Because the Board always had the authority to determine the amount of dues, whether the 2015 amendment purported to be retroactive is of no moment. The practical effect of the 2015 amendment was to prospectively incorporate the Shelley Rule into the Bylaws.

### The Broken Sound Club

The Club is a golf and social club located within the Broken Sound Master Association, a residential community in Boca Raton. Organized as a not-for-profit corporation, the Club's purpose "is to own and operate a private country club for the recreation, pleasure and benefit of its Members and their guests." All property owners within the community are required to become members of the Club and must maintain their membership in good standing. The Club is governed by an elected Board of Governors ("Board").

### The Membership Purchase Agreement

In 2004, Share purchased a home in the Broken Sound community and became a member of the Club. To become a member, Share entered into an irrevocable Membership Purchase Agreement (the "Agreement") with the Club, agreeing to be bound by all the "terms and conditions of the Club's Bylaws."

### Club Membership Levels

When Share joined the Club in 2004, the Club had four categories of membership: (1) Social; (2) Tennis; (3) Master; and (4) Old Course. Share selected a Social membership, the least expensive level. Social members were entitled to use (1) all of the West aquatic, social, and fitness facilities of the Club and (2) the West golf course and tennis facilities six times each during a membership year, upon payment of greens fees, golf cart fees, and court fees. Tennis members had access to the same amenities as Social members, as well as full access to the West tennis facilities. Master members had access to the same amenities as Tennis members, as well as full access to the West golf course. Finally, Old Course members had access to the same amenities as Master members, as well as access to all of the East Facilities, which included a separate golf course known as the "Old Course."

### 2004 Bylaws

The 2004 Bylaws were in effect when Share signed the Agreement and became a member of the Club.

Under the 2004 Bylaws, the Board had the power to (1) do all acts necessary to carry out the purposes of the Club, (2) determine the amount of dues, fees, and other charges, (3) prepare and amend budgets, (4) expend funds to the extent of the amount in the Club's treasury, (5) make

contracts, borrow money, and incur indebtedness, (6) cause promissory notes, bonds, mortgages or other evidences of indebtedness to be executed and issued, and (7) amend the Bylaws. Specifically, the 2004 Bylaws contain the following relevant provisions:

• Art. VI(1) – The Board shall "exercise all powers of the Club and do all acts and things necessary to carry out the purposes of the Club."

• Art. VI(2)(f) – The Board shall "determine the amount of dues, fees and other charges."

• Art. VI(2)(h) – The Board shall "have the power to prepare and amend budgets; to expend funds to the extent of the amount in the Club's treasury or owing to the Club; to make contracts, borrow money and incur indebtedness for the purposes of the Club; and, to cause promissory notes, bonds, mortgages or other evidences of indebtedness to be executed and issued."

• Art. XIII(1) – "Annually, the [Board] will set the dues and fees to be charged in advance to members and guests for the ensuing membership year, which will be the twelve (12) month period commencing October 1 and ending the following September 30. **The [Board] reserves the right to set the amount of annual dues to be payable by members at any level it deems appropriate.**"

• Art. XIII(2) – "All dues and fees, other than the capital replacement fund, will be applied against the Club's operating costs. It shall be the policy of the Club that the annual and all other dues, plus other receipts by the Club, shall be sufficient, insofar as possible to project, to meet the annual operating needs of the Club. The annual and other dues, as they are established from time to time by the Board of Governors, shall, insofar as possible, reflect this stated policy."

• Art. XVII(2) – "The [Board] shall have the power to make special assessments, in addition to annual dues, to cover operating deficits, if any. There will be no assessments for capital expenditures (exclusive of the capital replacement fund) in excess of $500,000.00 in a single fiscal year unless a majority of the votes entitled to be cast are in favor of the

capital assessment. Assessments for capital expenditures to the East Facilities must be approved by a majority of the votes entitled to be cast by the Old Course Members and the Charter Members only, and shall be borne equally by such members."

• Art. XVIII(2) – ". . . **the By-Laws may also be altered or amended by the [Board] at any regular or special meeting of the [Board]** . . . ."

(Emphasis supplied).

### *The General Fund and the Capital Replacement Fund*

The Club deposited all membership dues into a general fund, used to pay all operational expenses. The Club has never maintained separate bank accounts for each category of membership. Revenue generated from hosting events at the Old Course facilities, including weddings and golf tournaments, went into the general fund for the benefit of all members of the Club. Similarly, revenue generated from leasing a cell tower on the Old Course also went into the general fund.

The Club also maintained a Capital Replacement Fund, used to pay any necessary expenses associated with maintaining, renovating, and replacing the facilities, equipment, and furnishings of the Club. Proceeds from the sale of a parcel of land on the Old Course property were deposited into the Capital Replacement Fund for the benefit of the Club as a whole.

### *The Shelly Rule*

When Share joined the Club in 2004, the Board apportioned dues increases among each membership category by allocating costs to each category. For example, under this method, increases in the operating costs of the Old Course were charged only to Old Course Members.

In 2007, the Board unanimously adopted a policy of charging an equal amount of dues increases across all membership categories. This became known as the "Shelly Rule."[2]

Under the Shelly Rule, the Club used a graduated dues structure that established a base "fair value" of dues for each membership category. The lowest base amount was billed to Social Members and the highest base

---

[2] Share served on the Club's Finance Committee when it proposed spreading the annual dues increases equally across all membership levels.

amount was charged to Old Course Members. Each ensuing year, the anticipated increase in the budget was allocated equally among all members of the Club, so that each member would pay an equal share of the dues increase plus that member's base "fair value" amount. The Board adopted the Shelly Rule after performing a comprehensive study investigating how other similarly-situated clubs set their annual dues.

Sheldon "Shelly" Siegel, the Club's Treasurer in 2007, attested to the following reasons for the Shelly Rule: (1) the pre-2007 method for calculating dues was criticized each year by some portion of the Club's membership; (2) the Board realized that all amenities and facilities of the Club benefit every member; (3) it was often difficult to accurately allocate costs to each category of membership under the pre-2007 method, especially with costs that benefitted each level of membership; (4) it had become increasingly difficult for the Board to reach an agreement on the allocation of expenses on an annual basis; (5) the Shelly Rule created a formula for setting dues that would be easy to calculate and easy to understand; and (6) implementation of the Shelly Rule eliminated the need to negotiate the allocation of dues increases each year.

Following the adoption of the Shelly Rule, the Old Course Members continued to pay higher annual dues than all the other member categories.

The Board later amended Article VI(2)(f) of the Bylaws in March 2015 to apply the Shelly Rule beginning with the 2007-2008 fiscal year:

> The [Board] shall: Determine the amount of dues, fees and other charges. Beginning with the 2007-2008 fiscal year, Member dues for a given fiscal year will be set by adjusting the prior year's dues amount for each Member equally so that the total amount projected to be raised by Member dues is equal to or greater than the amount so required by the budget for that fiscal year. . . .

### The New Membership Plan

In 2016 and 2017, the Board unanimously adopted amendments to the Bylaws and other policy measures collectively known as the "New Membership Plan," which went into effect on October 1, 2017.

The Board implemented the New Membership Plan to address concerns facing the Club, including aging golf membership, declining golf participation, inequities within membership classes, and an existing policy that generally prohibited members from downgrading their membership.

Before voting on the New Membership Plan, the Board conducted an extensive review process with the assistance of an outside consultant. The Board worked with the Club's legal counsel to draft the proposed Amended and Restated Bylaws.

The New Membership Plan consisted of the following: (1) an equitable upgrade and downgrade policy; (2) restructuring of dues and membership categories; (3) sharing of all facilities; and (4) elimination of Old Course debt.

1. Upgrade and Downgrade Policy

The New Membership Plan allowed members to upgrade or downgrade their membership levels more freely. The New Membership Plan allowed more flexibility to aging members who could no longer golf. Prior to the New Membership Plan, the right to downgrade to a lower membership level was limited, which discouraged new golf memberships.

2. Restructuring of Dues to Achieve Parity

Prior to the New Membership Plan, there were multiple dues levels within membership categories. The New Membership Plan sought to simplify the dues structure, correct the inequities within membership categories, and reduce the differences between membership categories. This became known as "parity."

Under the New Membership Plan, new members would join one of three categories: Tennis, New Course (formerly Master), or Old Course. Each category would have one price. Additionally, dues differences within a category would disappear over time by applying scheduled annual fixed dues increases within a membership class.

In a December 2016 executive session, the Board determined that Article VI(2)(f) of the Bylaws needed to be amended because "in order to put the new membership plan into effect, the board must be empowered to adjust dues differently for each category of membership." Thus, the Board determined that it was "necessary to strike the words, 'for each member equally,' from the existing Bylaw."

In 2017, the Board also amended Bylaws to add the following language to Article XIII, Section 2, which governed dues:

> Notwithstanding Article VI, Section 2(f) of these Bylaws, the
> Board of Governors shall have the authority to make

adjustments (either increases or decreases) in the dues, fees or other charges within any Membership Category or Class in order to achieve parity between Members within such Membership Category or Class.

There were no intra-category parity increases for Social Members, since all Social Members paid the same amount of dues. However, for two fiscal years, Social Members were charged about $100 per year to create parity between the dues paid by Social Members of the Club and the dues paid by social members of comparable clubs. By contrast, the $100 parity surcharge was not assessed to Old Course Members.

### 3. Sharing of All Facilities

The New Membership Plan also eliminated some of the exclusive-use rights of the Old Course Members. Under the New Membership Plan, the dining facilities at the Old Course became available for all members, including Social Members. Also, the New Course Members were allowed to play golf on the Old Course during the offseason.

### 4. Elimination of Old Course Debt

Before 2004, the Club took out a multi-million dollar loan for the renovation of the Old Course clubhouse and golf course. The Club was the borrower with respect to the Old Course debt, which was collateralized by the assets of the Club as a whole. For years, the Old Course Members were charged capital assessments of $191 per month to repay the debt. However, as part of the New Membership Plan and in exchange for broader use of the Old Course facilities by all members, the Board discontinued the capital assessment of the Old Course Members. The outstanding debt was retired by proceeds from home sales and taken out of the Club's "reserve funds."

### *The Litigation and Entry of Summary Judgment*

In 2017, Share stopped paying her dues and assessments. The Club sued her for breach of contract and related claims arising out of her failure to pay her dues.

Share answered and asserted affirmative defenses. Share also filed a Verified Second Amended Counterclaim, asserting two counts against the Club: (1) a count to enjoin the ultra vires actions of the Club; and (2) a count for breach of the implied covenant of good faith and fair dealing. The gravamen of Share's counterclaim was that the Club, which she

7

alleged was controlled by Old Course Members, breached its contractual duty under the implied covenant of good faith "when it unilaterally changed the Bylaws so that it could disproportionately increas[e] her fees/dues/assessments for her Social Membership, to the direct benefit of Master Members and Old Course Members and to her detriment."

The Club moved for summary judgment as to both its complaint and Share's counterclaim. The Club presented undisputed evidence that Share's unpaid balance of dues and assessments amounted to $63,691.16. Share did not challenge this mathematical calculation, but argued that the Club's breaches relieved her of the obligation to pay.

The circuit court granted summary judgment in favor of the Club on its claims for the unpaid balance of Share's dues and assessments.

The court also granted summary judgment in favor of the Club on Share's counterclaims. First, the court ruled that there were no genuine issues of material fact regarding Share's ultra vires claim because the Club's complained-of actions—implementing the Shelly Rule and adopting the New Membership Agreement—were protected by the business judgment rule and were within the scope of the Board's authority under the Bylaws. The trial court reasoned that the Board deliberated and acted in good faith with respect to these decisions, and that there was no evidence of abuse of discretion, fraud, bad faith, or illegality.

The trial court further ruled that "the implied duty of good faith cannot be used to vary the express terms of the Agreement, including the Bylaws." The court reasoned that "the Agreement between Ms. Share and the Club expressly incorporates the Bylaws of the Club, which grants the Board the right to make changes affecting prior rights," and that "the Bylaws also authorize the Board to set dues, fees and other charges and to amend the Bylaws further." The court pointed out that the counterclaim "does not identify an express provision of the Agreement that Ms. Share alleges the Club breached."

On appeal, Share challenges the circuit court's rulings regarding her counterclaims.

### The Implied Covenant of Good Faith and Fair Dealing

"Every contract imposes an obligation of good faith and fair dealing between the parties in its performance and its enforcement"; if the promise "is not expressed by its terms in the contract, it will be implied." Richard A. Lorde, *Williston on Contracts* § 63:22 (4th ed. 2020); *see also Ins.*

*Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). An "implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999). "As a result, the force of this obligation varies with the context in which it arises." *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. 2d DCA 2000). Therefore, the "parties' expectations as to a responsibility that is exercised with 'sole discretion' should 'reasonably' be more limited than those for a responsibility that is exercised under a higher standard." *Id.*

Florida follows the majority view that "there can be no independent cause of action brought for breach of the covenant of good faith and fair dealing." *Williston on Contracts* at § 63:22. Rather, a breach of that covenant must be tied to the "performance of an express term of the contract." *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998). The implied duty of good faith "is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Id.*

The implied duty of good faith applies "when one party has the power to make a discretionary decision without defined standards." *Publix Super Markets, Inc, v. Wilder Corp. of Delaware*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004). For example, "sole discretion does not permit a party [to a contract] to make a discretionary decision that violates the covenant of good faith." *Sepe*, 761 So. 2d at 1185. However, where a party to a contract is vested with discretion in the performance of a contract obligation, the covenant of good faith is not breached unless no reasonable party in the same position would have made the same discretionary decision. *Id.*; *Publix Super Markets*, 876 So. 2d at 655.

Here, the trial court did not err in granting summary judgment as to Share's claims and defenses related to the implied duty of good faith. As a preliminary matter, Share misconstrues the trial court's ruling. The trial court did not hold that the implied duty of good faith "essentially evaporates" if a contract gives a party discretion to make a decision. Rather, the trial merely cited the uncontroversial proposition that the implied covenant of good faith cannot be used to vary the terms of a contract.

The Agreement and Bylaws unambiguously granted the Club the authority to set dues, fees, and other charges, as well as to amend the Bylaws. A private club's bylaws governing the terms of membership do not create vested rights and are subject to amendment. *See Hamlet*

9

*Country Club, Inc. v. Allen*, 622 So. 2d 1081, 1082–83 (Fla. 4th DCA 1993). Nothing in the record shows that the Board acted outside its authority specified in the controlling documents.

In exercising its discretionary powers under the Agreement and Bylaws, the Board was required to act in good faith in accordance with the duty the law implies.

Share argues that the Club violated the implied covenant of good faith in the manner in which it exercised its discretionary power. Much of Share's argument on the implied duty of good faith centers on the Board's amendments to the Bylaws. Specifically, she argues that the Board breached the implied covenant of good faith by: (1) amending the Bylaws in an unreasonable way that favored Old Course and/or Master Course Members to Share's detriment; (2) amending the Bylaws in an unreasonable way that decreased Old Course Members' dues and fees and increased Share's dues and fees; (3) using the Club's reserve funds to pay the capital expenditures related exclusively to the Old Course Members, in violation of the Bylaws; and (4) amending the Bylaws in a way that resulted in Share being charged for capital expenditures and operating costs of the Old Course and/or Master Course.

The record establishes that the Board acted in good faith in implementing these amendments. The record fails to demonstrate that no reasonable club board, in the same position as the Board in this case, would have made the same operational decisions. As we explain below, the Board demonstrated reasonable justifications for its decisions.

### *The Board's Actions Were Neither Ultra Vires Nor Arbitrary, Capricious, or in Bad Faith*

Share next argues that the trial court erred in relying on the business judgment rule to grant summary judgment where there were genuine issues of material fact as to whether the Club committed ultra vires acts, breaches of the Bylaws and Agreement, and actions that were arbitrary, capricious, or in bad faith. In particular, Share argues that it was unreasonable for the Club to: (1) implement the Shelly Rule and retroactively amend the Bylaws relating to the same; (2) pass the New Membership Plan which resulted in her being obligated to pay for capital expenditures on the Old Course facilities; and (3) pass the 2017 "parity" amendment to the Bylaws and improperly apply the amendment so that Old Course Members paid less. Finally, Share argues that the Club's amendments of the Bylaws, in and of themselves, constituted breaches of the Agreement and ultra vires acts because there was "no express

language in the [Agreement] stating that Ms. Share is bound by any amendments to the Bylaws."

We agree with the Club that there is no genuine issue of material fact regarding the scope of the Board's authority or the application of the business judgment rule. The evidence of good faith the Club presented, coupled with Share's failure to present any evidence of bad faith, established that the Club's acts were within the scope of the Club's authority under the Bylaws and Florida law. Applying the business judgment rule, we defer to the Board's decisions because they were "within the scope of [the Board's] authority" and were "not arbitrary, capricious or in bad faith." *Hollywood Towers Condo. Assoc., Inc. v. Hampton*, 40 So. 3d 784, 787 (Fla. 4th DCA 2010).

An ultra vires act is an unauthorized act. *Liberty Counsel v. Fla. Bar Bd. of Governors*, 12 So. 3d 183, 191 (Fla. 2009). It is one that is beyond the scope of power granted by the corporation's charter or bylaws. *Id.*

Under the business judgment rule, "a court presumes that corporate directors acted in good faith." *Kloha v. Duda*, 246 F. Supp. 2d 1237, 1243–44 (M.D. Fla. 2003). Absent fraud, self-dealing, criminal activity, or betrayal of trust, directors of associations are not personally liable for the decisions they make in their capacity as directors. *See Sonny Boy, LLC v. Asnani*, 879 So. 2d 25, 27 (Fla. 5th DCA 2004); *Perlow v. Goldberg*, 700 So. 2d 148, 149–50 (Fla. 3d DCA 1997). The business judgment rule also "prevents a factfinder from using hindsight to second-guess directors' business decisions." *Kloha*, 246 F. Supp. 2d at 1244. And the business judgment rule applies to ultra vires claims against the corporation itself. *See Yarnall Warehouse & Transfer, Inc. v. Three Ivory Bros. Moving Co.*, 226 So. 2d 887, 892 (Fla. 2d DCA 1969).

"While the business judgment rule traditionally applied to protect corporate directors from personal liability in their business dealings, courts may use the rule to evaluate the management decisions of property associations and to avoid second-guessing those decisions." *Miller v. Homeland Prop. Owners Ass'n, Inc.*, 284 So. 3d 534, 537 (Fla. 4th DCA 2019). "When applying the business judgment rule to the decisions of a property association, the test is: 1) whether the association had the contractual or statutory authority to perform the relevant acts; and 2) if so, whether the board acted reasonably." *Id.*

In short, courts must give deference to an association's decision "if that decision is within the scope of the association's authority and is reasonable—that is, not arbitrary, capricious, or in bad faith." *Hampton*,

40 So. 3d at 787. Although the question of reasonableness is ordinarily an issue of fact, a summary judgment in favor of an association should be affirmed if the record plainly demonstrates that the association's actions were reasonable. *Miller*, 284 So. 3d at 357.

Here, the trial court properly ruled that there were no genuine issues of material fact regarding whether the Club committed ultra vires acts. The underlying facts are not in dispute. It is undisputed that the Club implemented the Shelly Rule and the New Membership Plan. It is also undisputed that the Club made the relevant amendments to the Bylaws. The only question is whether the record shows that the Club's actions were reasonable.

We reject Share's argument that she is not bound by the amendments to the 2004 Bylaws. Share's Agreement with the Club incorporated the Club's Bylaws by reference. Share agreed to be bound by the Club's Bylaws, and the Bylaws expressly state that they may be amended. Therefore, Share is bound by the amendments to the 2004 Bylaws. *See OBS Co., Inc. v. Pace Const. Corp.*, 558 So. 2d 404, 406 (Fla. 1990) ("It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing.").

Share nonetheless points out that the language in her Agreement is different from the language in the Club's membership agreement for Master Members, which expressly states that members agree to be bound by the terms and conditions of the Bylaws "as they currently exist and as they may be amended in the future." However, this language in Master-Member agreements regarding future amendments is superfluous, given that the Bylaws are incorporated by reference into the agreement for Master Members and the Bylaws expressly state that they may be amended in the future. That a different membership agreement specifically mentioned future amendments to the Bylaws has no bearing on the proper interpretation of Share's Agreement in this case.

Turning to the specific acts about which Share complains, the Board's actions were facially reasonable. First, the implementation of the Shelly Rule in 2007 was within the Board's authority to determine dues and was a reasonable exercise of that power. Although Share complains that the Shelly Rule unfairly shifted costs from Old Course Members to Social Members, the Board's decision was a reasonable solution to the dues issue it confronted. The Shelly Rule split annual increases in the budget evenly across membership classes, but Old Course Members still paid

significantly higher base dues than Social Members. And the Shelly Rule recognized that Social Members benefitted from revenue generated by Old Course facilities, even if Social Members did not personally use the facilities. Splitting annual dues increases evenly across membership classes avoided the complexity of allocating costs to the different membership classes and eliminated the need to negotiate dues each year.

The implementation of the Shelly Rule was not arbitrary, capricious, or in bad faith, so we apply the business judgment rule and defer to the Board's decision. It is not our role to second-guess or micromanage the dues structure of a private club simply because a new rule for dues increases may slightly benefit one membership class over another.

The implementation of the New Membership Plan was also reasonable as a matter of law. The Board undertook a deliberate process, engaging a consultant and drafting the amendments to the Bylaws with the assistance of counsel. Although the New Membership Plan eliminated special capital assessments for Old Course Members, this was in exchange for the other members receiving greater access to Old Course facilities. Moreover, the other members were not assessed to pay for the outstanding debt, which was already an obligation of the entire Club. Instead, the outstanding debt was satisfied by proceeds from home sales and taken out of the Club's "reserve funds." This action was within the Club's authority to expend funds, did not violate any Bylaws, and was a reasonable business decision. Finally, we conclude that it was reasonable for the Club to charge Social members a $100 "parity" fee for two years to create parity between the dues paid by Social Members of the club and the dues paid by social members of comparable clubs.

We affirm the final judgment entered by the circuit court.

*Affirmed.*

LEVINE, C.J., and ARTAU, J., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***

13